# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1084

_____

United States of America

*Plaintiff - Appellee*

v.

Lodgy Jackson

*Defendant - Appellant*

_____

No. 14-1488

_____

United States of America

*Plaintiff - Appellee*

v.

Andreus O'Bryant

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 15, 2015
Filed: April 10, 2015
_____

Before WOLLMAN, SMITH, and SHEPHERD, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Jamie Benson traveled from Houston, Texas, to St. Louis, Missouri, to sell a half kilogram of cocaine to Andreus O'Bryant. In the early morning hours of April 22, 2011, Lodgy Jackson shot Benson in the back of the head, killing him.

Jackson pleaded guilty to one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846; conspiracy to possess a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(o); and possession, brandishing, and discharge of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j)(1). He was sentenced to 400 months' imprisonment. Jackson argues that his guilty plea was not knowing and voluntary because the district court[1] did not adequately advise him of his rights. He also contends that his sentence is substantively unreasonable.

O'Bryant pleaded guilty to one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. He was sentenced to 330 months' imprisonment. O'Bryant argues that his sentence violates the Fifth and Sixth Amendments; that the evidence was insufficient to support the first-degree-murder sentencing enhancement; that at best, the evidence supported the

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

-2-

second-degree-murder sentencing enhancement; and that his sentence is substantively unreasonable.  We affirm.

## I.  Background

The factual background set forth below is based on the evidence presented at O'Bryant's sentencing hearing.

Jamie Benson was a drug dealer who sold marijuana and cocaine.  He lived in Houston with his roommate, Deallen Nettles.  Benson and Nettles traveled to St. Louis in March 2011 to sell one kilogram of cocaine.  According to Nettles, O'Bryant led them to a house in St. Louis, where the sale was supposed to take place, but they were robbed instead.  So ended Benson's first St. Louis-based drug venture.

In early April 2011, O'Bryant purchased plane tickets for Jackson and Desmond Stringfellow to travel from Houston to St. Louis.  Around that same time, O'Bryant and Benson began discussing the sale of a half kilogram of cocaine. Stringfellow testified that he, O'Bryant, and Jackson agreed to steal the cocaine and kill Benson.  O'Bryant gave Stringfellow a .32 caliber firearm and gave Jackson a .40 caliber Glock.

In late April 2011, Benson persuaded Nettles to travel with him to the St. Louis area to sell a half kilogram of cocaine.  Benson told Nettles that things were going to be different this time and that "[Benson] wouldn't let anyone see the drugs until he saw some money."  An older woman known as "Aunt Pat" accompanied Benson and Nettles, and the three left on April 20, 2011, driving through the night and arriving at an apartment complex in Washington, Missouri, on the afternoon of April 21, 2011.

According to Nettles, they went to a second-floor apartment to meet O'Bryant, Jackson, and Stringfellow.  Shortly after they arrived, Scott Compton entered the

apartment and followed O'Bryant to a room in the back of the apartment. Compton later exited the back room, spoke briefly to the group, and left the apartment. Compton testified that O'Bryant had asked him to come to the apartment, act as if he were going to purchase the cocaine, and say, "[W]e don't do business like that up here in Missouri." Compton went along with the plan.

After Compton left, Benson, Nettles, and Aunt Pat followed O'Bryant, Jackson, and Stringfellow to Compton's house. Compton exited his house and entered O'Bryant's truck carrying a plastic bag, which Nettles believed held cash. Compton testified that O'Bryant had instructed him to carry a plastic bag and that "[i]t was supposed to look like it had money in it." According to Nettles, O'Bryant told the others that they would continue to another house to pick up the rest of the money needed to complete the transaction. After driving for about an hour, they stopped in a rural area. O'Bryant then supposedly took Compton to obtain the rest of the money, leaving the others to wait in the dark, wooded area.

Stringfellow and Compton testified that there was never going to be a drug deal. Stringfellow explained that Compton played the role of a "fake buyer" so that O'Bryant and the others could locate the cocaine, which—unbeknownst to them—was hidden in the rear bumper of Nettles's car. According to Stringfellow, O'Bryant had given instructions to kill Benson and his companions once the cocaine was located. Stringfellow was supposed to kill Nettles, and Jackson was supposed to kill Benson and Aunt Pat.

When O'Bryant and Compton returned to the location where the others were waiting, O'Bryant indicated that the transaction could be completed. According to Stringfellow, "[O'Bryant] told us to do it then, soon as he sees the cocaine, soon as he brings it out to kill them then." Benson exited Nettles's vehicle and moved toward the rear bumper, but he did not retrieve the cocaine because a downpour interrupted the transaction.

-4-

The occupants of the two vehicles then drove to a gas station. Out of the view of O'Bryant, Jackson, and Stringfellow, Benson took the cocaine from its hiding place and brought it inside Nettles's car. Everyone then returned to the St. Louis area. Compton went home, and the others reconvened at O'Bryant's house. According to Nettles, O'Bryant said that Compton had called repeatedly and indicated that he wanted to complete the transaction. O'Bryant, Jackson, and Benson then left the house. Nettles, Aunt Pat, and Stringfellow went to a fast-food restaurant, ordered food, and then returned to O'Bryant's house. Nettles concealed the cocaine in the fast-food bag and hid the bag in a couch. Stringfellow went upstairs and fell asleep.

Nettles recounted his final conversation with Benson. Nettles called Benson, who said that O'Bryant and Jackson were going to "hit a lick," meaning that they were going to commit robbery to obtain the money needed to purchase the cocaine. Benson said that he had told the men that he did not want to be involved in any robbery. Nettles offered to pick up Benson, who declined the offer and thereafter ended the phone call.

Nettles called Benson several times after that conversation. When the calls went straight to voicemail, Nettles knew something was wrong. He and Aunt Pat decided to leave O'Bryant's house, taking with them the cocaine and a piece of mail that bore O'Bryant's full name and address. When Stringfellow awoke, Nettles and Aunt Pat were gone. O'Bryant later returned. According to Stringfellow, O'Bryant was furious when he discovered that the cocaine and Benson's companions were gone.

According to Stringfellow, O'Bryant said, "I lost everything, Lodgy killed him." Stringfellow testified that he accompanied O'Bryant to the garage where O'Bryant's truck was parked. Stringfellow put on gloves, reached inside the truck, and grabbed his return plane ticket. Stringfellow noticed that there was "[b]lood and

[a] bullet hole, bleach and a whole bunch of things in the car." When asked what Jackson had said about the incident, Stringfellow replied,

> He told me that [O'Bryant] was inside the house and they were outside in the alley and [O'Bryant] was playing like he was going to rob [another drug dealer] so that [Benson] could get out of the car and they wouldn't have to kill him in the car, but that wasn't working. [Jackson] said he kept texting [O'Bryant], saying let me do it, let me do it now, can I do it now and he wasn't getting an answer. . . . [Jackson] said he killed [Benson], he hit him from the backseat, [Jackson] and [another man] drug him out of the car and [Jackson] took off.

Stringfellow observed Jackson using a hammer in an attempt to destroy the .40 caliber Glock that was used to kill Benson.

After Nettles sold the cocaine in Chicago, he and Aunt Pat returned to Houston. Nettles called the police department in O'Fallon, Missouri, to report that Benson was missing and provide information about O'Bryant. Nettles later learned that Benson had been found dead in an alley.

A grand jury returned a six-count indictment against O'Bryant and Jackson, charging them with conspiracy to possess with intent to distribute cocaine (count one) and conspiracy to possess a firearm in furtherance of a drug-trafficking crime (count two). It further charged Jackson with possessing a firearm in furtherance of a drug-trafficking crime (count three) and O'Bryant with intimidating, threatening, and corruptly persuading three individuals to make false statements to investigators and the federal grand jury (counts four, five, and six). Jackson was arrested shortly after the indictment was returned, but O'Bryant remained on the lam for eleven months before being arrested in Houston.

## II. Jackson's Guilty Plea and Sentence

Jackson pleaded guilty to counts one, two, and three pursuant to a written plea agreement. The government agreed to recommend a sentence of 360 months' imprisonment. The plea agreement stated that the district court "alone will determine whether to accept the [government's] recommendation." As set forth more fully below, the district court explained to Jackson during the change-of-plea hearing that it was not required to impose the recommended sentence and that Jackson could not withdraw his guilty plea if the recommended sentence was not imposed.

Under the United States Sentencing Guidelines (Guidelines), Jackson's final sentencing range was 480 months' imprisonment to life.[2] Jackson requested a 240-month sentence. The government recommended a 360-month sentence. After considering the sentencing factors set forth in 18 U.S.C. § 3553(a), the district court imposed a sentence of 400 months' imprisonment: a 280-month sentence on count one, a concurrent 240-month sentence on count two, and a consecutive 120-month sentence on count three.

### A. Jackson's Guilty Plea

Jackson argues that the district court failed to adequately advise him that he could not withdraw his plea if the court decided to impose a sentence lengthier than the one recommended by the government. Jackson entered a guilty plea pursuant to

---

[2]Jackson's total offense level for counts one and two was 40, his criminal history category was III, and his sentencing range was 360 months' to life imprisonment. Count three—possession, brandishing, and discharge of a firearm in furtherance of a drug-trafficking crime—carried a mandatory, consecutive sentence of at least ten years' imprisonment. See 18 U.S.C. § 924(c)(1)(A)(iii). Jackson admitted in his plea agreement and at his change-of-plea hearing that he had discharged a firearm in furtherance of a drug-trafficking crime.

Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure. Rule 11(c)(3)(B) required the district court to advise Jackson that he "ha[d] no right to withdraw the plea if the court d[id] not follow the [government's sentencing] recommendation."

At the change-of-plea hearing, the district court explained to Jackson that it did not have to impose the recommended sentence. It confirmed that Jackson understood "that the decision whether or not to accept that recommendation at sentencing would be totally up to [the court]." The district court reiterated that "the mere fact that the parties are recommending that doesn't mean I'm going to go along with it." Moreover, the district court explained that the Guidelines were advisory, that the court was free to sentence Jackson above or below the Guidelines range, and that Jackson might be considered an armed career criminal, which would mean a higher total offense level and a higher criminal history category. Finally, the district court explained:

> Court: Now, do you understand, sir, that I don't have to follow any of the guidelines recommendations contained in this plea agreement?
>
> Jackson: Yes.
>
> Court: And do you understand, sir, that if I do not [follow] the guideline agreements contained in this document, you're still going to be stuck with your plea and you're not going to be able to withdraw your plea just because I didn't follow the recommendations contained in this plea agreement?
>
> Jackson: Yes, ma'am.

The district court's advice to Jackson that he could not withdraw his guilty plea even if the court did not impose the sentence that the government recommended fulfilled its Rule 11(c)(3)(B) obligations.

## B. Jackson's Sentence

Jackson argues that his sentence is substantively unreasonable because the district court failed to take into account the government's recommended sentence and the substantial assistance Jackson had provided. See United States v. Feemster, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("A district court abuses its discretion when it (1) fails to consider a relevant factor that should have received significant weight . . . ." (citation and internal quotation marks omitted)). The transcript makes clear that the district court considered those factors when it decided to sentence Jackson below the Guidelines range. In evaluating the totality of the circumstances, however, the district court decided that the 360-month sentence recommended by the government was too lenient.

> [W]hile I am willing to depart downward to give effect to the Government's agreement, I continue to struggle with the fact that at the time of the defendant's plea, I observed a level of acceptance of responsibility that I have not seen since. And I think that there are still significant issues . . . with respect to Mr. Jackson's acceptance of responsibility here, and realizing the impact of these actions, the [e]ffect it has had on people's lives and I frankly do not see remorse for anyone other than Mr. Jackson.

We hold that Jackson's 400-month sentence is not substantively unreasonable and that the district court did not abuse its discretion in imposing it.

## III. O'Bryant's Guilty Plea and Sentence

O'Bryant pleaded guilty to count one pursuant to a written plea agreement. The parties agreed that O'Bryant was accountable for 510 grams of cocaine, but they did not agree on his offense level. The government maintained that O'Bryant's base offense level should be 43 under Guidelines § 2D1.1 and its cross-reference to

§ 2A1.1, which provides the base offense level for first-degree murder. The presentence investigation report (PSR) also recommended application of the cross-reference. O'Bryant denied knowledge of any plan to murder Benson and argued that the cross-reference should not apply.

The district court held a two-day sentencing hearing, during which Nettles, Stringfellow, and Compton testified. O'Bryant objected to Nettles's testimony regarding his final conversation with Benson. The government argued that it was not eliciting the testimony for its truth, but rather to explain why Nettles decided to contact the police and report Benson as missing. The district court overruled the objection, explaining that the testimony would not be accepted as true and would not be used to establish relevant conduct. The district court also overruled the hearsay objection to Stringfellow's testimony regarding what Jackson had said about killing Benson, holding that it was not hearsay because it was a statement by a coconspirator in furtherance of the conspiracy.

At the close of the evidence, the district court addressed the PSR and O'Bryant's objections to the Guidelines calculations. The district court rejected O'Bryant's arguments that the application of the cross-reference violated his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury. It also found that the government had proved by a preponderance of the evidence that the conspiracy involved the killing of Benson under circumstances that would constitute first-degree murder:

> [T]here is quite a substantial amount of evidence supporting a finding that there was in fact a conspiracy involving the defendant[;] that the defendant Mr. O'Bryant, was in fact the individual calling the shots on this conspiracy; that he was the person directing how it happened and when [it] happened except to the extent that events transpired that were beyond his control, such as the sudden rainstorm and such as Mr. Jackson killing Mr. Benson inside the car instead of outside the car.

-10-

. . . .

> I believe that the facts here well support a finding that this defendant caused the killing of another human being, and did so in a premeditated manner as part of a fairly elaborate, but at times misguided scheme.

The district court thus applied the cross-reference to § 2A1.1 and determined that O'Bryant's base offense level was 43 "because this was a knowing, willful, premeditated matter, a conspiracy to commit such a murder that continued and was ongoing, and about which this defendant had never withdrawn." The district court granted O'Bryant a 3-level decrease for acceptance of responsibility and found that O'Bryant's total offense level was 40, his criminal history category was I, and his sentencing range was 292 to 365 months' imprisonment. After considering the sentencing factors set forth in 18 U.S.C. § 3553(a), the district court sentenced O'Bryant to 330 months' imprisonment.

## A. Application of § 2A1.1 Cross-Reference

O'Bryant argues that the district court should not have applied the first-degree-murder cross-reference set forth in § 2A1.1. We review the district court's interpretation and application of the Guidelines *de novo* and its factual findings for clear error. United States v. Muckle, 755 F.3d 1024, 1025 (8th Cir. 2014).

Guidelines § 2D1.1 sets forth the base offense level for possessing with intent to distribute cocaine and the specific offense characteristics that increase or decrease the base offense level. Section 2D1.1(d) is entitled "Cross References" and instructs the district court as follows:

> (1)    If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States,

-11-

apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

18 U.S.C. § 1111(a) defines murder as "the unlawful killing of a human being with malice aforethought." The statute provides that first-degree murder includes "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing." Id.

O'Bryant argues that the application of the § 2A1.1 first-degree-murder cross-reference violated his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury. Specifically, he contends that the district court's application of the § 2A1.1 cross-reference sentenced him "for a murder he was never charged with, a murder he denies being involved in, and a murder that was never proven, to a jury, beyond a reasonable doubt." O'Bryant acknowledges that our precedent holds that a defendant's constitutional rights are not violated when a district court applies the first-degree-murder cross-reference set forth in § 2A1.1, see United States v. Clay, 579 F.3d 919, 929-30 (8th Cir. 2009), but argues that the Supreme Court's decision in Alleyne v. United States, 133 S. Ct. 2151 (2013), casts doubt on our panel decision. Alleyne held that any fact that increases the mandatory minimum sentence to which a defendant is exposed is an "element" of the crime and must be submitted to the jury. Id. at 2155.

Alleyne does not prevent the application of the § 2A1.1 cross-reference in this case. We addressed this precise issue in United States v. Davis, 753 F.3d 1361 (8th Cir. 2014) (per curiam), a decision issued after this appeal was filed. In Davis, the district court applied the § 2A1.1 cross-reference and sentenced the defendant to the statutory maximum term of imprisonment for being a felon in possession of a firearm. We rejected the defendant's argument that the district court violated Alleyne by applying the § 2A1.1 cross-reference without having a jury act as the fact-finder.

-12-

Application of the § 2A1.1 cross-reference neither increases the penalty beyond the statutory maximum, see Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), nor increases the mandatory minimum, see Alleyne, 133 S. Ct. at 2155. Regarding whether a jury is required, application of a statutory maximum or minimum [is] to be distinguished from "factfinding used to guide judicial discretion in selecting punishment within limits fixed by law. While such findings of facts may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern the element of sentencing."

Davis, 753 F.3d at 1361-62 (quoting Alleyne, 133 S. Ct. at 2161 n.2 (citation and internal quotation marks omitted)). Davis thus forecloses O'Bryant's Alleyne argument.[3]

O'Bryant next argues that the evidence was insufficient to support the application of § 2A1.1. O'Bryant argued at sentencing and continues to argue on appeal that any conspiracy to kill Benson and steal his cocaine ended in the woods, when the downpour interrupted the ruse drug deal, and that Jackson later acted alone and without premeditation when he shot Benson. O'Bryant also contends that Stringfellow's testimony should have been excluded as incredible. Stringfellow was involved only in the conspiracy that ended with the downpour and not in any later conspiracy, O'Bryant argues, and his testimony regarding the statements that Jackson allegedly had made were not in furtherance of the first conspiracy.

---

[3]O'Bryant argues in passing that he was denied his Sixth Amendment right to confront witnesses when the district court admitted Nettles's testimony regarding his last conversation with Benson and Stringfellow's testimony regarding what Jackson said. Assuming, *arguendo*, that the testimony was hearsay, the district court did not err in admitting it. "We have held that the admission of hearsay during sentencing proceedings does not violate a defendant's rights under the Confrontation Clause." United States v. Pepper, 747 F.3d 520, 525 n.4 (8th Cir. 2014) (citing United States v. Brown, 430 F.3d 942, 944 (8th Cir. 2005)).

-13-

The district court did not clearly err in finding that the conspiracy continued after the rain-interrupted ruse drug deal and that it included the killing of Benson. Moreover, the district court found the witnesses credible, observing that it "had the opportunity to observe these witnesses, to observe their demeanor, to carefully attempt to assess the degree to which their testimony was corroborated by other testimony." We have no basis upon which to question the district court's credibility determination. See United States v. Battle, 774 F.3d 504, 517 (8th Cir. 2014) ("Credibility determinations are squarely within the discretion of the district court and are given special deference." (citations and internal quotation marks omitted)). We conclude that a preponderance of the evidence supported its finding that Benson's murder was willful, deliberate, malicious, and premeditated. Accordingly, we hold that the district court did not err in applying § 2A1.1.[4]

## B. O'Bryant's Sentence

O'Bryant contends that his 330-month sentence is substantively unreasonable. He continues to argue that the first-degree-murder cross-reference should not have applied, that he was not involved in any conspiracy to kill Benson, that Benson's murder was not premeditated, and that the witnesses who testified at the sentencing hearing were unreliable. The district court considered the arguments O'Bryant now advances on appeal, and we have addressed them above. Our review of the record satisfies us that this is not the "unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." Feemster, 572 F.3d at 464 (citation and internal quotation marks omitted).

---

[4]Having decided that the evidence was sufficient to support application of § 2A1.1, we reject O'Bryant's argument that—at most—the evidence supported the cross-reference to § 2A1.2, second-degree murder.

-14-

## IV.  Conclusion

We affirm the judgment in all respects.  We dismiss as moot the government's motion to dismiss Jackson's appeal.

_____