# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-1236

_____

United States of America

*Plaintiff - Appellee*

v.

Andre Taylor

*Defendant - Appellant*

_____

No. 15-2269

_____

United States of America

*Plaintiff - Appellee*

v.

Victor Vickers

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 13, 2016
Filed: February 24, 2016

_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

A jury convicted Andre Taylor of two counts charging distribution of cocaine and marijuana and two counts based on a murder for hire conspiracy. The jury also convicted Victor Vickers of conspiracy to distribute marijuana. Taylor and Vickers each appeal. We affirm their convictions but remand Vickers' case for resentencing.

I.

Of the twenty defendants charged in the indictment, fifteen entered guilty pleas, two are fugitives, and three, including Taylor and Vickers, proceeded to trial. Taylor and Vickers were each charged with one count of conspiracy to distribute 1,000 kilograms or more of marijuana or 5 kilograms or more of cocaine. See 21 U.S.C. §§ 841(a)–(b), 846. Taylor was also charged with one count of aiding and abetting the distribution of cocaine, one count of conspiracy to commit murder for hire, and one count of possession of a machine gun in furtherance of a crime of violence.[1] See id. § 841(a)–(b); 18 U.S.C. §§ 958, 924(c)(1)(B)(ii). The evidence at trial established the following record relating to these counts.

_____

[1]Taylor was also indicted on an additional count of aiding and abetting the distribution of cocaine which was dismissed on the government's motion.

A.

Robert Taylor pled guilty to the drug distribution conspiracy and then testified. He explained that he had introduced Andre Taylor to Charlie "Mike" Williams, a drug dealer in Mexico who later became Andre Taylor's supplier.[2] Williams had agreed to supply large quantities of marijuana and cocaine to Taylor who planned to sell them in Kansas City and then forward payment to Williams. Taylor hired a team of drivers to transport the drugs to Kansas City in trailers filled with inoperative "dummy" equipment which concealed large loads of drugs hidden beneath the floorboards. Witnesses testified that up to 27 kilograms of cocaine and 800 pounds of marijuana were sent in each shipment. Driver Ruben Machiche testified that he had personally transported thousands of pounds of marijuana for Taylor. Allen Sanchez, who had supervised the drivers, testified that he had overseen the delivery of over 100 kilograms of cocaine and between 8,000 and 9,000 pounds of marijuana to Kansas City. According to Sanchez, he sent over $9 million to Mexico on Taylor's behalf.

Taylor ran his Kansas City operations out of three houses on Hardesty Avenue. There, he stored large quantities of drugs and various "tools of the trade" such as firearms, ammunition, digital scales, plastic bags, and surveillance cameras. Police executed a search warrant on the houses, and at trial multiple coconspirators testified that they had purchased marijuana and cocaine from Taylor and had seen large quantities of drugs in the houses. The government also submitted recordings obtained from wiretaps on Taylor's cell phones. It sought to authenticate several of those recordings through the testimony of FBI Task Force Officer (TFO) Mark Corbin, who identified Taylor's voice. The district court admitted the wiretap evidence over Taylor's objection that the FBI witness could not identify the voices of persons he had never met such as his.

Vickers' alleged role in the drug conspiracy was more limited than Taylor's. Robert Taylor testified that Vickers had asked if he could get involved with his Mexican

_____

[2]Williams is one of the two defendants in this case who are fugitives.

drug business, but Vickers was turned down. Testimony at trial showed, however, that Vickers had purchased several pounds of marijuana from multiple coconspirators, including Rahmon Allen and Darryl Taylor. The latter was Andre Taylor's nephew and one of his main customers, and he testified that all of the marijuana he sold to Vickers had come from Andre Taylor. Other witnesses also testified that Vickers had sold smaller amounts of marijuana to his own customers, and the government submitted a wiretap recording in which Vickers could be heard negotiating a marijuana price with an unidentified third party. There was, however, no evidence that Vickers ever bought or sold cocaine.

## B.

TFO Corbin testified that two government confidential informants (CIs) had made nine controlled purchases of cocaine from Taylor, one of which formed the basis for the aiding and abetting charge against him. Coconspirator Daniel Howard testified that he had unwittingly served as a middleman for that controlled buy after an unidentified CI had solicited drugs from him. Howard had called Taylor and asked him to deliver the drugs to an address where the CI and he were waiting. When Taylor arrived, Howard took money from the CI, met Taylor in his car, exchanged the money for drugs, and gave the drugs to the CI.

Corbin, who had supervised that controlled buy, testified that his surveillance team had seen Howard come out of the house where the CI was waiting, get into a car, and then go back inside. He also testified that after the CI contacted him, he field tested the purchase and the results were presumptively positive for cocaine. The amount of money he gave the CI was also consistent with the size of the purchase. Because Corbin's testimony about what the surveillance team had seen exceeded the scope of his personal knowledge, however, Taylor moved for a mistrial. The court denied that motion but struck Corbin's testimony about the CI's actions.

C.

Witnesses testified that Andre Taylor's apartment was burglarized on New Years Eve 2011 and that large amounts of cash and drugs were stolen. Robert Taylor testified that Andre Taylor believed that coconspirator Billy Brown was responsible for the burglary and offered $10,000 to anyone who would "knock Billy off." Robert Clark, one of Taylor's customers, similarly testified that Taylor had asked his brother Antwan Clark to lure Brown to a fake drug deal so that Taylor could "fuck him up" and get his money back. The government also introduced evidence of a phone call between Taylor and codefendant Eric Union, who had also been charged with the murder for hire conspiracy. During that phone call, Taylor told Union that it was "necessary to kill [Brown]."

Robert Taylor further testified that Andre Taylor had at one point tried to shoot Brown in south Kansas City, but he had escaped. The government then called Kansas City police officer Kenneth Woodward, who testified that Brown had come to the police station and told him that someone had shot at him while he was driving. Woodward testified that he had examined Brown's vehicle and that it appeared the back windows had been shot out. Taylor objected, arguing that Woodward's testimony about what Brown had said violated his right to confront adverse witnesses. The court overruled that objection and admitted Woodward's testimony.

The government later called Kenneth Vaughn Cooper, who had pled guilty to the murder for hire conspiracy. Cooper testified that Eric Union had put him in touch with Taylor, who had a job for him. Cooper testified that Taylor had asked him to kill Brown, but he had agreed only to burglarize Brown's house in exchange for a portion of the cash or drugs inside. The government also introduced evidence of a phone call between Cooper and Taylor during which Cooper agreed to retrieve a "hammer" (apparently a gun) from one of Taylor's houses on Hardesty. After intercepting that call, the police followed Cooper from his home in Kansas to Taylor's house and arrested him as he departed, recovering a machine gun from his vehicle. While Cooper acknowledged that he had retrieved a gun from Taylor's house, he maintained that he had only intended to

use it to burglarize Brown. The government then called Kevin Blum, who testified that Cooper had told him in jail that he had been arrested for possessing a firearm which he had intended to use to kill someone.

## D.

The jury convicted Taylor on all counts and Vickers on a lesser included offense of conspiracy to distribute less than 100 kilograms of marijuana. Vickers' presentence investigation report indicated that he, his cousin Garron Briggs, and a third unidentified man were suspected of murdering a man named Edward Ewing while attempting to recover stolen cocaine and cash. At sentencing the government introduced a video interview of Ewing's girlfriend, who claimed she had witnessed this murder, and she identified Vickers as one of the men who had attacked Ewing. One of the investigating officers then testified that a large sum of money had been stolen from Briggs and that Ewing may have been accused as a "scapegoat" for the theft.

Based on this record, the district court found that the Ewing murder was "drug-related activity" and applied the murder cross reference in the drug trafficking guideline. That cross reference provides that if a victim is murdered, the court should apply the guideline for first or second degree murder if doing so results in a greater offense level. U.S.S.G. § 2D1.1(d)(1). The district court applied guideline § 2A1.1 for first degree murder in sentencing Vickers, increasing his base offense level from 12 to 43, and it sentenced him to 60 months in prison, the maximum sentence available. See 21 U.S.C. § 841(b).

Taylor and Vickers appeal, each challenging the sufficiency of the evidence supporting his conviction. Taylor also appeals the district court's denial of his motion for a mistrial and the court's evidentiary rulings, specifically focusing on the 24 wiretap recordings as well as Officer Woodward's testimony. Taylor further argues that cumulative errors deprived him of his right to a fair trial. Vickers also appeals his

sentence, arguing that the sentencing court committed procedural error in applying the murder cross reference.

## II.

### A.

We review a challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict, accepting all reasonable inferences supporting it, and affirming "if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." United States v. Scofield, 433 F.3d 580, 585 (8th Cir. 2006). We conclude that the evidence was sufficient to support the convictions of Taylor and Vickers for the following reasons.

The government presented sufficient evidence to support Taylor's conviction of conspiracy to distribute over 1,000 kilograms of marijuana or over 5 kilograms of cocaine. "To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Conway, 754 F.3d 580, 587 (8th Cir. 2014). Here, multiple coconspirators testified that Taylor had agreed to buy large quantities of marijuana and cocaine from Charlie Williams, to ship those drugs to Kansas City using a team of drivers, and to distribute the drugs in Kansas City and send money back to Williams. The government also introduced wiretap recordings of phone calls in which Taylor discussed his drug related activities, including his business with Williams, as well as photographs of drugs and "tools of the trade" found by police while searching his houses. This evidence would allow a jury to find that there was a conspiracy between Taylor and others to import and distribute marijuana and cocaine in Kansas City in the amounts charged, that Taylor knew about that conspiracy, and that Taylor intentionally joined it.

Taylor suggests that the coconspirators' testimony is not credible because those witnesses had a "motive to testify and something to gain." We will defer to the jury's assessment of witness credibility, however, and a conspiracy conviction may be based solely on coconspirator testimony. See United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007). Taylor also asserts that the district court erred in admitting 24 wiretap recordings and argues that without those recordings there would have been insufficient evidence to sustain his conviction. As discussed below, the district court did not err in admitting the wiretap recordings, and there was extensive coconspirator testimony supporting Taylor's conviction for conspiracy to distribute marijuana or cocaine. See id.

The government also presented sufficient evidence to support Vickers' conviction for conspiracy to distribute less than 100 kilograms of marijuana. The evidence at trial showed that Vickers had asked Robert Taylor if he could participate in his Mexican drug connection, demonstrating that he knew about that operation. The evidence also showed that Vickers had on multiple occasions purchased resale quantities of marijuana from coconspirators Rahmon Allen and Daryl Taylor, at least some of which came from Andre Taylor. Testimony and wiretap evidence further showed that Vickers had sold smaller amounts of marijuana to his own customers. On this record, a reasonable juror could find that Vickers had intentionally joined the conspiracy in which his suppliers were participating. See Conway, 754 F.3d at 588–89.

Vickers argues that Darryl Taylor's testimony is entitled to little weight because it was lacking in detail and was uncorroborated by other evidence. Credibility determinations are "virtually unreviewable on appeal," however, and "in reviewing a defendant's challenge to the sufficiency of the evidence, witness testimony does not need to be corroborated." United States v. Keys, 721 F.3d 512, 519–20 (8th Cir. 2013) (internal quotation marks and alterations omitted). Vickers also argues that the evidence showed at most that he had participated in isolated drug transactions, not that he had joined a conspiracy. Evidence that he engaged in multiple purchases of resale quantities of marijuana was, however, "sufficient in and of itself to make a submissible case of a

conspiracy to distribute." Conway, 754 F.3d at 588. We conclude that sufficient evidence supported Vickers' conviction.

The government also presented sufficient evidence to support Taylor's conviction for aiding and abetting the distribution of cocaine. That offense has three elements: "(1) the defendant associated [himself] with the unlawful venture; (2) the defendant participated in it as something [he] wished to bring about; and (3) the defendant sought by [his] actions to make it succeed." United States v. Ellefson, 419 F.3d 859, 863 (8th Cir. 2005). Here, coconspirator Daniel Howard testified that he had brokered a drug deal between Taylor and an unidentified government CI in which Taylor had supplied him with drugs, intending that he then sell them to the CI. TFO Corbin testified that a field test of the CI's purchase was presumptively positive for cocaine and that the amount of money he had given the CI was consistent with the amount of cocaine purchased. This evidence could allow a reasonable jury to find that Taylor had aided and abetted the sale of cocaine to the CI.

Taylor contends that Howard's testimony was insufficient to support his aiding and abetting conviction because it was not corroborated by other evidence. As previously discussed, however, corroborating evidence is not necessary in a review of the sufficiency of the evidence. Keys, 721 F.3d at 519. Taylor also asserts that Corbin's testimony did not prove that the substance exchanged was cocaine because Corbin "may or may not be the person who sent the item [the CI purchased] to the lab." To the extent that Taylor is arguing that the government was required to submit a chemical test to prove that the item purchased was cocaine, we disagree since "[i]t is well established in this circuit that the identity of a controlled substance can be proven beyond a reasonable doubt by circumstantial evidence and opinion testimony." United States v. Cole, 537 F.3d 923, 927 (8th Cir. 2008). We conclude that sufficient evidence supported Taylor's aiding and abetting conviction.

Finally, the government presented sufficient evidence to support Taylor's convictions of conspiracy to commit murder for hire and possession of a machine gun

-9-

in furtherance of a crime of violence. To convict for conspiracy to commit murder for hire under 18 U.S.C. § 1958, the government must prove that the defendant "(1) travelled or caused another to travel in interstate commerce, (2) with the intent that a murder be committed, (3) for hire." United States v. Delpit, 94 F.3d 1134, 1149 (8th Cir. 1996). Here, Taylor caused Cooper to cross the state line between Kansas and Missouri by directing him to retrieve a firearm from his house on Hardesty. In addition, Taylor asked multiple people to help him kill Brown, demonstrating that Taylor intended that Brown be murdered. Finally, Taylor offered to pay $10,000 to whoever agreed to commit that murder, and he promised Cooper cash and drugs in exchange for his assistance in killing Brown. On this record, a jury could reasonably find that Taylor had conspired with Cooper to commit murder for hire.

Taylor argues that the government failed to prove that Cooper had agreed to kill Brown, emphasizing that he testified that he intended only to burglarize Brown's house. We will defer to the jury's assessment of Cooper's credibility, however, and there was sufficient circumstantial evidence to allow the jury to infer that Cooper had agreed to commit murder. See, e.g., Conway, 754 F.3d at 587. The evidence showed that Taylor wanted Brown killed, that he asked Cooper to kill Brown, and that Cooper obtained a machine gun to take with him to Brown's house. On this record, the jury could reasonably infer that Cooper intended to use that gun to murder Brown, particularly in light of Kevin Blum's testimony confirming that intent. See United States v. Wells, 646 F.3d 1097, 1104 (8th Cir. 2011). We therefore conclude that sufficient evidence supported Taylor's conviction for conspiracy to commit murder for hire. We also conclude that sufficient evidence supported Taylor's conviction for possession of a machine gun in furtherance of a crime of violence, because the record shows that Taylor possessed the machine gun retrieved by Cooper in furtherance of the conspiracy. See 18 U.S.C. § 924(c)(1).

B.

We next address Taylor's arguments that the district court erred in denying his motion for a mistrial and in admitting 24 wiretap recordings and Officer Woodward's testimony, as well as his cumulative error argument. None provides a basis for reversal.

We review a district court's ruling on a motion for mistrial for an abuse of discretion. See, e.g., United States v. Espinosa, 585 F.3d 418, 428 (8th Cir. 2009). Taylor argues that the district court abused its discretion by denying his motion for mistrial after TFO Corbin testified about details of a controlled buy he personally knew nothing about. Even though the trial court has "broad discretion to grant or deny a motion for mistrial," the admission of a "prejudicial statement is normally cured by striking the testimony and instructing the jury to disregard the remark." Id. Here, the district court did strike the improper testimony, and Taylor does not explain why this failed to cure any prejudice. We conclude that the district court did not abuse its discretion in denying Taylor's motion for a mistrial.

We also review a district court's evidentiary rulings for an abuse of discretion, disregarding errors that do not affect a party's substantial rights. See, e.g., United States v. Beckman, 787 F.3d 466, 477 (8th Cir. 2015). Taylor argues that the district court abused its discretion by permitting TFO Corbin to identify his voice on 24 wiretap recordings because Corbin had never spoken with Taylor in person. A witness may offer "[a]n opinion identifying a person's voice . . . based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901. Here, the record showed that several of the recorded phone calls were on a phone number that had been linked to Taylor, and Taylor identified himself during at least one of these calls which indicates that he participated in it. See United States v. Pruitt, 702 F.2d 152, 155 (8th Cir. 1983). Further, a "telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." United States v. Garrison, 168 F.3d 1089, 1093 (8th Cir. 1999). Here, many of the recordings included details of Taylor's drug activities and those of other

-11-

coconspirators. On this record, we conclude that there was a sufficient basis on which Corbin could identify Taylor's voice and that the district court did not abuse its discretion by admitting these recordings.

Taylor also asserts that the district court violated his right to confront adverse witnesses by admitting Officer Woodward's testimony that Billy Brown reported that he had been shot at. We review Confrontation Clause challenges de novo. Young, 753 F.3d at 772. The Confrontation Clause bars admission of a witness's testimonial hearsay statements unless the witness is unavailable and the defendant has had a prior opportunity to cross examine him. See United States v. Wright, 739 F.3d 1160, 1170 (8th Cir. 2014). We need not decide whether the admission of Woodward's testimony violated Taylor's right to confrontation, however, because any error in admitting that testimony would have been harmless beyond a reasonable doubt. See United States v. Holmes, 620 F.3d 836, 844 (8th Cir. 2010).

"Evidence erroneously admitted in violation of the Confrontation Clause is harmless beyond a reasonable doubt as long as the remaining evidence is overwhelming." Id. Here, the challenged testimony was relevant only to Taylor's intent to have Brown murdered, and the government provided overwhelming independent evidence of that intent. That additional evidence included testimony from multiple witnesses showing that Taylor sought assistance in killing Brown, as well as a wiretap recording in which Taylor stated that it was "necessary to kill [Brown]." Further, the government submitted evidence indicating that Cooper had agreed to murder Brown for hire, including phone calls in which Taylor asked him to kill Brown and testimony showing that Cooper had later obtained a machine gun from Taylor's house. On this record, we conclude that overwhelming evidence independent of Woodward's testimony established that Taylor had conspired with Cooper to have Brown murdered for hire. See id. at 845. Any error in admitting that testimony was therefore harmless beyond a reasonable doubt.

Taylor finally argues that cumulative errors deprived him of his right to a fair trial. "We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." United States v. Samples, 456 F.3d 875, 887 (8th Cir. 2006). On this record, any error that the district court may have committed was harmless. We affirm Taylor's convictions.

III.

We finally address Vickers' argument that the district court erred in applying the murder cross reference in § 2D1.1(d)(1) of the sentencing guidelines for his alleged involvement in the murder of Edward Ewing. "We review de novo the district court's application of the Guidelines, and we review for clear error the district court's factual findings." United States v. Patrie, 794 F.3d 998, 1000 (8th Cir. 2015). The guideline applicable to drug trafficking includes a cross reference providing that if a victim is murdered, courts should apply the applicable murder guideline in sentencing the defendant. See U.S.S.G. § 2D1.1(d)(1). Here, that cross reference will only be applicable if the Ewing murder is relevant to Vickers' offense of conviction under guideline § 1B1.3.[3] See id. § 1B1.3. We conclude that the district court erred by applying the murder cross reference because the Ewing murder would not be relevant conduct under § 1B1.3.

Subsection (a)(1) of § 1B1.3 specifies that relevant conduct includes all acts "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). In this case, there was no evidence that the Ewing murder occurred during, in preparation for, or in the course of attempting to avoid

---

[3]Although § 1B1.3 does not apply to cross references if the guidelines specify otherwise, the drug trafficking guideline does not disclaim its applicability. See, e.g., United States v. Williams, 431 F.3d 767, 772 (11th Cir. 2005).

-13-

detection for the marijuana conspiracy of which Vickers was convicted. Even if the murder was "drug-related activity" as the district court found, the government alleges that it arose from the theft of cocaine, not marijuana. In addition, there was no evidence that either of Vickers' alleged accomplices in the Ewing murder were connected to the marijuana conspiracy. Based on this lack of evidence, we conclude that the district court erred to the extent that it found that the Ewing murder was relevant conduct under subsection (a)(1). See, e.g., United States v. Ewing, 632 F.3d 412, 417 (8th Cir. 2011).

The Ewing murder still could be relevant conduct under subsection (a)(2) of § 1B1.3, however. That subsection provides that relevant conduct also includes all acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). This definition, however, "applies only to offenses for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts." Ewing, 632 F.3d at 417 (internal quotation marks omitted). Section 3D1.2(d) of the guidelines requires multiple counts to be grouped for sentencing purposes where the offense level is determined by the aggregate harm caused or if "the offense behavior is ongoing or continuous in nature." U.S.S.G. § 3D1.2(d). It further provides a list of offenses that are expressly included in and excluded from grouping. See id. Here, the Ewing murder is not relevant conduct under subsection (a)(2) because even if it was part of the same course of conduct as the marijuana conspiracy, § 3D1.2(d) provides that murder cannot be grouped with other crimes. Id.

The government appears to argue that only the crime of conviction, not the relevant conduct offense, must be capable of grouping for subsection (a)(2) to apply, citing our court's decision in United States v. Jackson, 782 F.3d 1006 (8th Cir. 2015). Jackson did not address that issue, however, and we reject the concept. Our court has previously recognized that subsection (a)(2) applies if the offense of conviction and the relevant conduct offense would have been grouped together had the defendant also been convicted of the latter offense. See United States v. Cole, 525 F.3d 656, 658–59 (8th Cir. 2008). As the Cole court explained, "[a] defendant need not be charged with or

-14-

convicted of the [relevant] conduct as long as it could form the basis for a count that would be grouped with the offense of conviction." Id. at 659. We conclude based on this language that the proper focus under (a)(2) is whether both the offense of conviction and the relevant conduct offense would be grouped under § 3D1.2(d). Notably, nearly all of the circuit courts to consider this question have reached the same conclusion. See United States v. Horton, 693 F.3d 463, 478 (4th Cir. 2012) (collecting cases). The Ewing murder is therefore not relevant conduct under (a)(2) because it cannot be grouped with Vickers' offense of conviction, and we conclude that the district court erred in applying the murder cross reference when sentencing him. We therefore vacate his sentence and remand his case for resentencing.

## IV.

For these reasons we affirm the convictions of Taylor and Vickers, but we vacate Vickers' sentence and remand his case for resentencing consistent with this opinion.

_____