# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2510
_____

United States of America

*Plaintiff - Appellee*

v.

Danny William Gehl, Jr.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 25, 2024
Filed: February 19, 2025
_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

In a search of a Minnesota warehouse, police found 788 pounds of marijuana bagged and piled up all over the floor, crates for transporting the marijuana, various marijuana products and paraphernalia, and six people—including Defendant Danny Gehl. Gehl was charged with and proceeded to trial on one count of conspiracy to distribute marijuana and one count of possession with intent to distribute marijuana. After a trial in which the government presented evidence from the warehouse search,

a search of Gehl's house, and months of surveillance, Gehl was convicted of both counts and the district court[1] sentenced him to the mandatory minimum sentence of 120 months' imprisonment. He now appeals, arguing that the evidence was insufficient to convict him and that he was improperly denied both safety-valve relief and a minor-participant downward adjustment at sentencing. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

"We recite the facts in the light most favorable to the jury's verdict." United States v. Brandon, 64 F.4th 1009, 1013 (8th Cir. 2023) (citation omitted).

Police first began investigating this drug distribution scheme in January 2021. They had received a tip a few months prior stating that a group of four people, which did not include Gehl but did include his brother David Gehl, were involved in the illegal distribution of marijuana between Minnesota and California. Following up on the tip, police learned that the group operated a sham business which rented two warehouses, one in St. Paul, Minnesota, and one in Northern California, that the business routinely shipped crates back and forth between the warehouses, and that the co-conspirators would fly back and forth between Minnesota and California at the same times the crates were shipped. Based on this pattern, police believed the group was shipping money or empty crates to California, then shipping marijuana back from California to Minnesota. Officers began using surveillance to corroborate this theory.

Police first became acquainted with Danny Gehl during February 2021 surveillance of the operation in Minnesota. A shipment of crates arrived at the Minnesota warehouse, and Gehl, who arrived a few hours after the shipment, was one of about six workers who helped process the shipment at the warehouse. He

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

assisted the others in loading suspected marijuana into their vehicles, and then he loaded his own vehicle with bags and boxes of suspected marijuana. After loading their vehicles, most of the six returned to their homes. Gehl and one other associate drove to Gehl's home, where they unloaded the bags and boxes.

Two months later, police surveillance observed another shipment arrive with Gehl again arriving at the warehouse a few hours after the shipment, helping other associates load their vehicles, and loading his own vehicle. After loading up, Gehl locked the warehouse door and then he and one other associate drove to Gehl's home, where they unloaded the bags and boxes and took them inside. The two then returned to the warehouse, loaded their vehicles again, and separated; Gehl drove back to his home and unloaded his vehicle by himself.

When investigators learned that two months later another shipment was expected to arrive, they obtained search warrants for several different locations, including the warehouse and Gehl's home. On the day of the searches, the officers watched as associates unloaded containers from the truck that had shipped them, but did not immediately execute the search warrant. Gehl entered the warehouse midafternoon, and the officers executed the search warrant about six minutes later.

Inside, there was a "[v]ery strong smell of marijuana." Officers found shipping crates that they had tracked going back and forth between St. Paul and California. The crates appeared to be homemade and were lined with a self-hardening foam which both helped protect the crates from breaking and served as a mask for the smell of marijuana inside. They had hatches for accessing the materials inside. One of the crates had boxes of THC derivatives (vapes and edibles) still inside it. Strewn about the warehouse floor, bags of marijuana had been separated into piles based on their brand. In total, officers seized 788 pounds of a substance that appeared to be marijuana, a note listing the amounts purchased of various marijuana brands, and $22,934 in cash.

The government randomly selected 31 one-pound bags (one of each brand of marijuana) for laboratory testing. All 31 samples contained THC (also known as delta-9-tetrahydrocannabinol). But even when THC is present in a substance, it is not considered marijuana unless more than 0.3% of the substance is THC. Thus, one randomly selected bag was subject to further testing to determine the purity level of the cannabis contained in the bag. The THC purity in that bag was 6.4%, well above the 0.3% threshold to be considered marijuana.

On the same day, police also searched Gehl's home. There, they found "marijuana all throughout the house" that was "packaged for sales" and looked similar to the marijuana found at the warehouse. They also found THC vapes, gummies, and other edibles, pound-size marijuana bags with marijuana residue in them, a drug ledger, a digital scale, a money counter, a metal ammunition can with live ammunition, and many wads of cash. In total, officers seized nearly seven pounds of marijuana and $186,948 in cash. They later searched Gehl's phone, which they seized from him at the warehouse, and found photos of marijuana and large amounts of cash as well as text correspondence with people asking Gehl for marijuana and related products. In some of the texts, Gehl stated that he did not have product immediately available but would on a certain date; officers matched these dates up with the dates of marijuana shipments from California. Officers also searched the homes of the other conspirators. Investigators found drugs, drug paraphernalia, and cash at those residences as well.

Officers also discovered that this California-Minnesota shipping operation had been active since at least 2017. Gehl only flew to California twice, but both flights were taken with other associates of the organization and coincided with shipments between California and Minnesota. In total, shipping records show 31 shipments from California to Minnesota.

Gehl was charged, along with five co-conspirators, with conspiracy to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count 1); conspiracy to commit money

-4-

laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h) (Count 2); and possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2 (Count 3). Count 2 was dismissed prior to trial; Gehl proceeded to trial on Counts 1 and 3. At trial, in addition to presenting witness testimony, the Government also introduced physical evidence of some of the marijuana, video and still shots from all three of the relevant surveillance days, photographs of what was found at the Minnesota warehouse and in Gehl's home when the search warrants were executed, and other various records. Gehl did not present any evidence. The jury convicted Gehl, and Gehl did not move for a judgment of acquittal.

Following the conviction, Gehl requested and participated in a proffer interview with the Government. A truthful proffer interview could have entitled him to a "safety-valve" reduction in sentencing. See 18 U.S.C. § 3553(f). In the hour-plus-long interview, Gehl denied participation in the conspiracy and said his co-conspirators had lied to him about what was in the bags that he was moving.

At sentencing, Gehl argued for two relevant adjustments: the safety-valve relief and the minor-participant downward adjustment. The mandatory minimum for a drug offense involving 1,000 kilograms or more of marijuana is 120 months' imprisonment, see 21 U.S.C. § 841(b)(1)(A)-(B), but the safety-valve provision would have enabled Gehl to seek a sentence below the mandatory minimum, see 18 U.S.C. § 3553(f). The district court rejected both of Gehl's arguments, noted the Guidelines range of 151-188 months' imprisonment, and sentenced Gehl to 120 months' imprisonment (the mandatory minimum) and five years of supervised release on each count to run concurrently.

Gehl now appeals. He argues his conviction should be overturned due to insufficiency of the evidence, asserting there was neither enough evidence to show that Gehl knew he was transporting marijuana nor to establish that the conspiracy involved at least 1,000 kilograms of marijuana. He also argues the district court

erred in denying him the safety-valve and minor-participant reductions at sentencing.

## II.

Gehl first argues the evidence was insufficient to support his conviction on Count 1. He contends that the Government failed to establish that Gehl knew the bags contained marijuana because "[t]he garbage bags were thick and opaque," the marijuana packages inside "were triple sealed to prevent scent from being detected," and "[i]t is entirely possible that Gehl was asked by his brother to move trash out of the business and did so without realizing he was moving marijuana." Appellant Br. 13-14. He further argues the Government failed to prove the amount—1,000 kilograms or more of marijuana—because it only presented evidence that a single one-pound bag was fully tested.

Where, as here, the defendant "did not move for judgment of acquittal at the close of the government's case, at the close of all evidence, or after the jury's verdict . . . . we reverse only if the district court, in not *sua sponte* granting judgment of acquittal, committed plain error." See United States v. Calhoun, 721 F.3d 596, 600 (8th Cir. 2013). To establish plain error, Gehl must show "(1) error, (2) that is plain, . . . (3) that affects substantial rights" and that (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings. See United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005) (en banc) (citation omitted).

The district court did not plainly err in not sua sponte granting judgment of acquittal. A conspiracy charge requires proof of three elements: "[(1)] an agreement to achieve an illegal purpose, [(2)] that the defendant knew of this agreement, and [(3)] that the defendant intentionally joined the conspiracy." United States v. Agofsky, 20 F.3d 866, 870 (8th Cir. 1994); see also R. Doc. 262, at 18 (instructing the jury that the crime of conspiracy has three elements). The parties agree that only the knowledge element (the second element) is at issue on appeal.

A defendant's knowledge of conspiracy "is generally established through circumstantial evidence, and no direct evidence of an explicit agreement need be introduced to prove a conspiracy, since a tacit understanding may be inferred from circumstantial evidence." United States v. Benitez, 531 F.3d 711, 716 (8th Cir. 2008) (citation omitted). The evidence in this case established Gehl worked in concert with the other five members of the conspiracy. He flew to California twice with co-conspirators around the same time that shipments were sent from California to Minnesota; he assisted with processing the shipment at the Minnesota warehouse on at least three different occasions; he had nearly $187,000 in cash, bags of marijuana that matched those found at the warehouse, and various other drug paraphernalia at his house; and his cell phone records showed that his product availability for drug sales coincided with shipments arriving in Minnesota. Furthermore, drug dealing is "an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." Maryland v. Pringle, 540 U.S. 366, 373 (2003). When investigators entered the warehouse just six minutes after Gehl entered, they found marijuana in plain sight all over the warehouse. It was reasonable for the jury to infer that this was a familiar sight that Gehl would have seen the other times he showed up to the warehouse following a shipment, and that the other associates allowed Gehl into the warehouse because they recognized him as a co-conspirator. Gehl argues that it was possible he believed he was moving trash or motorcycle parts rather than marijuana, Appellant Br. 14, "but the presence of one possible 'innocent' explanation for the government's evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilt beyond a reasonable doubt." See United States v. Maloney, 466 F.3d 663, 667 (8th Cir. 2006).

Similarly, there was adequate evidence that the conspiracy involved 1,000 kilograms or more of marijuana. Gehl faults the government for "only present[ing] evidence that one, one-pound bag of suspected marijuana was tested and came back meeting the requirements." Appellant Br. 14. A defendant in a conspiracy may be convicted based on "all reasonably foreseeable drug quantities that were in the scope of the criminal activity that he jointly undertook." United States v. Foxx, 544 F.3d

943, 951 (8th Cir. 2008) (citation omitted).  Gehl points to no case law—and we have found none—that requires the government to seize and test a full 1,000 kilograms of marijuana in order to survive such a sufficiency challenge.  Cf., United States v. Taylor, 813 F.3d 1139, 1147 (8th Cir. 2016) (rejecting sufficiency challenge when testimony of co-conspirators, wiretap recordings of phone calls, photographs of drugs, and "tools of the trade" were sufficient to "allow a jury to find that there was a conspiracy . . . in the amounts charged"); United States v. Trogdon, 575 F.3d 762, 767 (8th Cir. 2009) (affirming jury verdict over a sufficiency challenge even though the only testimony proving that the conspiracy involved 1,000 kilograms of marijuana came from two co-conspirator witnesses who estimated how much marijuana was involved); United States v. Foxx, 544 F.3d 943, 950 (8th Cir. 2008) (upholding over sufficiency challenge jury verdict convicting defendant of conspiracy to distribute 1,000 kilograms or more of marijuana based on testimony of witnesses).  Furthermore, in the sentencing context "we have consistently rejected arguments demanding direct evidence of drug identity, quantity, or purity."  United States v. Walker, 688 F.3d 416, 423 (8th Cir. 2012).  Here, the government presented evidence that the shipment officers seized had three crates, the contents of which weighed 1,498 pounds—52.6% (788 pounds) of which were marijuana.  That was one of 31 shipments, the contents of which weighed a total of 30,046 pounds.  Applying that same 52.6% to the weight of all the shipments would equate to 15,804 pounds—or 7,168.6 kilograms—of marijuana, more than seven times the "1,000 kilograms or more" the jury found.  At least one officer testified as such, stating that if the non-seized shipments contained similar amounts of marijuana, the amount of marijuana they contained would be "[w]ay over" a thousand kilos.  Furthermore, all 31 of the bags tested positive for THC, and the one bag that was randomly selected for further testing was found to contain about 6.4% THC, more than 21 times the 0.3% threshold for marijuana.  It was thus reasonable for the jury to infer the conspiracy involved at least 1,000 kilograms of marijuana.  See Walker, 688 F.3d at 423-24 (noting in the sentencing context that drug quantities may be proven "by circumstantial evidence and opinion testimony" (citation omitted)).

Based on the evidence in this case, the district court did not err, much less plainly so, in failing to sua sponte grant judgment of acquittal to Gehl.

## III.

Gehl next argues that the district court erred at sentencing by improperly denying him safety-valve relief on the basis that Gehl's proffer was not truthful. "We review for clear error a district court's findings as to the completeness and truthfulness of a defendant's safety-valve proffer." United States v. Soto, 448 F.3d 993, 995 (8th Cir. 2006) (citation omitted).[2]

As provided for in 18 U.S.C. § 3553(f), the safety-valve provision allows "'less knowledgeable and less culpable offenders' . . . to avoid application of the 'often harsh statutory minimum sentences' if they give full and truthful information about their offenses before sentencing." United States v. Alvarado-Rivera, 412 F.3d 942, 944 (8th Cir. 2005) (citation omitted). To be eligible for safety-valve relief, defendants must satisfy five criteria.[3]    18 U.S.C. § 3553(f).    The fifth

---

[2]Gehl asserts that this Court's precedent is "not entirely clear" on the standard of review for application of safety-valve relief and argues that this Court should apply de novo review. See Appellant Br. 15 (quoting United States v. Mays, 993 F.3d 607, 618 (8th Cir. 2021)). Mays made that statement as to the standard of review in considering "the adequacy of the district court's explanation" for rejecting a downward variance at sentencing. 993 F.3d at 618. But Gehl has not challenged the sufficiency of the district court's explanation for sentencing on appeal. Thus, we need not consider that argument.

[3]Eligibility for safety-valve relief requires the defendant to prove: "(1) he 'does not have more than 1 criminal history point;' (2) he 'did not use violence or credible threats of violence . . . in connection with the offense;' (3) 'the offense did not result in death or serious bodily injury to any person;' (4) he 'was not an organizer, leader, manager, or supervisor of others in the offense;' and (5) he 'has truthfully provided to the Government all information and evidence [he] has concerning the offense or offenses . . . .'" Talavera v. United States, 842 F.3d 556, 557 n.1 (8th Cir. 2016) (alterations in original) (citations omitted).

requirement—the only one disputed here—requires that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." Id. § 3553(f)(5). Simply conveying the "basic facts" of the crime is insufficient to entitle a defendant to safety-valve relief. Soto, 448 F.3d at 996 (citation omitted). "A defendant must prove 'through affirmative conduct, that he . . . gave the Government truthful information and evidence about the relevant crimes before sentencing." Id. (citation omitted). Gehl contends that his safety-valve proffer—the only disputed element—was sufficient because Gehl showed up and answered questions. The government responds that Gehl's proffer was not truthful.

The district court did not err in determining that Gehl did not qualify for safety-valve relief because he had not been truthful in his proffer. One witness, an agent who was present during Gehl's proffer, testified that Gehl's statements were "[n]ot at all" truthful because Gehl's answers were "vague, nonexistent, or just implausible." For instance, when asked about his two flights to California and texts he sent while there, Gehl told officers he had never gone there and that someone must have used his ID and phone. He further stated that he never looked inside the black bags he helped move and did not know what was in them. Gehl did not affirmatively prove that he conveyed even the "basic facts" of the crime to the Government, let alone "truthful information and evidence" about it. See Soto, 448 F.3d at 996 (citations omitted). Thus, the district court did not err in crediting the testimony of the witness at sentencing and denying Gehl's motion for safety-valve relief.

IV.

Finally, Gehl argues that he should have received a downward adjustment for being a minor participant in the conspiracy. Gehl received the mandatory minimum sentence of 120 months' imprisonment. Nothing that we say will change Gehl's sentence. "Win or lose, it makes no difference—his sentence will remain [120]

months because of the mandatory minimum." <u>United States v. Corrigan</u>, 6 F.4th 819, 820-21 (2021).  Thus, because we cannot "provide . . . any effectual relief," this issue is moot.  <u>See</u> <u>id.</u> (alteration in original) (citation omitted).

V.

For the foregoing reasons, we affirm the judgment of the district court.

_____