# United States Court of Appeals
### For the Eighth Circuit

———————————————————

No. 19-1938

———————————————————

United States of America

*Plaintiff - Appellee*

v.

Sean Washington, also known as Lil Folk

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the District of Minnesota

——————————

Submitted: May 15, 2020
Filed: August 4, 2020

——————————

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

——————————

MELLOY, Circuit Judge.

After the district court[1] found Defendant Sean Washington competent to stand trial, he pleaded guilty to one count of conspiring to distribute cocaine base and

———————————————

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable David T. Schultz, United States Magistrate Judge for the District of Minnesota.

heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court imposed a below-Guidelines-range sentence of 160 months' imprisonment. On appeal, Washington challenges the competency determination, the determination of his advisory Guidelines sentencing range, and the substantive reasonableness of the ultimate sentence imposed. We affirm.

I.

Washington has an extensive history of gang violence and drug offenses. This history includes a murder conviction and several instances of gun violence as a shooter and a victim. By the time of the events surrounding the current offense, Washington was using a wheelchair due to spinal injuries from a bullet. In addition, he was shot in the head in 2009 and still has metal fragments in his head from that shooting. Shortly after the 2009 shooting, his resulting cognitive impairments were described as "mild to moderate."

Authorities conducted a wide-reaching investigation between 2016 and 2017 into a violent gang-related drug distribution conspiracy in Minneapolis. The investigation included many confidential informants, controlled buys, wiretaps, search warrants and police-observed drug transactions. Evidence of Washington's personal involvement with the conspiracy included wire-tapped phone calls of Washington receiving orders for drug deliveries or discussing drug supplies, his direction of drug deliveries, and his participation in drug deliveries. In general the final or retail element of the conspiracy operated as a sort of dispatch system with a frequently replaced "dope phone" that would receive orders and direct deliveries. Quantities involved during given periods of time were extrapolated from known quantities of powder or crack cocaine, numbers of calls placed, resulting deliveries, and known delivery quantities.

In February 2017, authorities executed a search warrant at a home Washington had rented using false employment records. Washington shared the home with the conspiracy's ultimate leader. During execution of the warrant, Washington was present with drugs, cash, scales, and other drug paraphernalia. Washington was found in bed with his wheelchair positioned next to the bed and with a loaded pistol located under the wheelchair's seat cushion. The pistol was positioned so that Washington could have retrieved it by the grip when sitting in the chair. A shell casing from the same pistol had been located outside the home of another member of the conspiracy.

Washington was not taken into custody until later, August 20, 2017, after he checked into a hospital in Iowa. After being taken into custody, Washington had interactions with several different judicial officials and his case progressed substantially prior to any party suggesting a competency exam might be appropriate. In Iowa, he met with a pretrial services officer and appeared before a federal magistrate judge. He was informed of his rights and the charges from Minnesota, and he waived a preliminary hearing and detention hearing. After being transported to Minnesota, he appeared before a different federal magistrate judge for an initial appearance on September 19, and was represented by counsel from the office of the Federal Public Defender. Then, on September 21, at an arraignment and detention hearing, he was represented by attorney John Hughes who continues to represent him. At the hearing, Washington responded to the magistrate judge's questions and confirmed he had reviewed his indictment with his attorney. At a November 21 hearing on a motion to suppress, in front of a third federal magistrate judge, counsel raised the issue of having difficulty obtaining physical therapy for Washington. At that time, counsel suggested Washington's memory might be "challenged," but counsel did not raise the issue of competency.

Then, in December, counsel arranged for a neuropsychological evaluation for Washington with privately retained psychologist Dr. Norman Cohen. Dr. Cohen met and evaluated Washington for a day and sent an unsigned report to counsel. In the report, Dr. Cohen concluded Washington could think logically, but had low intelligence and thought in a concrete manner with limited sophistication. Dr. Cohen ultimately considered the testing results he obtained to be valid, but he did not offer an opinion in terms of Washington's ability to understand his charges or the proceedings against him or his ability to communicate with his attorney or assist in his defense. Rather, Dr. Cohen concluded Washington's performance was "consistent with that of a vulnerable adult and [a] guardianship appears appropriate."

On January 8, 2018, the third magistrate judge issued a report and recommendation denying Washington's motion to suppress, and Washington objected. On January 25, Washington sent a letter to the court withdrawing his objections and informing the court he had reached a plea agreement. By that time all conspirators other than Washington and the ultimate leader had pleaded guilty.

Then, at a February 6 hearing that was scheduled as a change-of-plea hearing, Washington's counsel instead moved for a competency hearing. The court ordered an evaluation. Washington was transferred to a Federal Detention Center in a different state for approximately forty days for an examination to determine if he was "presently . . . suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

There, psychologist Dr. Cynthia Low served as Washington's primary examiner, but he also met with a psychiatrist and another psychologist. Dr. Low had worked at the Federal Detention Center for over twenty years and had extensive experience conducting competency evaluations. She conducted several clinical

-4-

interviews with Washington over an extended period of time, conducted tests of Washington's abilities, and also administered tests to evaluate whether he was malingering. In addition, she reviewed his medical and criminal histories and reviewed recorded phone conversations, texts, and emails he sent to friends and others while in the examination facility. In a comprehensive report dated April 17, 2018, she concluded unequivocally that Washington was malingering. In fact, Dr. Low reported that, on certain tests, Washington scored so low that it was nearly statistically impossible that he had merely gotten answers wrong. He had to have known the correct answers and purposefully answered incorrectly to achieve such a low score. She also noted his ability to interact naturally and at a natural pace in private conversations. Finally, she noted his performance and apparent understanding in discussions of his charges, the consequences of his charges, and the roles of judges and attorneys. She ultimately concluded he could adequately understand the charges and proceedings against him, and "did not suffer from a mental disorder that would substantially impair his present ability to understand the nature and consequences of the court proceedings brought against him, or to assist in his defense."

Washington retained a second psychologist, Dr. John Cronin, who met with him for approximately one hour and reviewed Dr. Low's and Dr. Cohen's reports prior to sending a report to counsel in May 2018. Dr. Cronin then met with Washington a second time shortly before Washington's June 2018 competency hearing. Dr. Cronin did not address the federal statutory competency standard of 18 U.S.C. § 4241(a), but he did conclude more generally that Washington "lacks many of the necessary features to be judged as 'competent' to stand trial." Dr. Cronin criticized Dr. Low's report but did not tether his criticisms to the federal competency standards.

At the competency hearing, the examiners testified in person or remotely, and Washington did not testify. After the hearing, the magistrate judge prepared a report and recommendation finding Washington competent to stand trial. In the report, the

magistrate judge found Dr. Low's analysis most compelling, the reports of Drs. Cohen and Cronin "simply lacking," and Dr. Cronin's critique of Dr. Low's report as suggesting a fundamental "lack of familiarity with the competency standard in federal court."

Washington filed objections, which the district court rejected, and Washington pleaded guilty, preserving his objections to the competency determination. At his change-of-plea hearing, Washington testified and interacted with the court. Outstanding questions remaining for sentencing included the drug quantity attributable to Washington for determining a base offense level and the applicability of a two-level enhancement for possession of the firearm in connection with the drug offense. At sentencing, the district court found Washington responsible for between 840 grams and 2.8 kilograms of cocaine base and 7 grams of heroin. In addition, the district court found the firearm enhancement applied. Washington's advisory Guidelines range was 168 to 210 months' imprisonment. Washington sought a downward departure based on an overstated criminal history, USSG § 4A1.3, his physical impairments, id. § 5H1.4, and his mental impairments, id. § 5K2.13. He also asked for a downward variance. The district court imposed a below-range sentence of 160 months, stating, "I am going to give you a sentence that's below, slightly below, the guidelines. It is hard to figure out what you have done to earn that, but I do think [it] is appropriate." The district court expressly rejected the § 4A1.3 downward departure request based on criminal history but did not expressly reject the health-related departure requests. Rather, in the written statement of reasons for the sentence imposed, the district court characterized the below-range sentence as a variance rather than a departure. Washington appeals.

## II.

We review a district court's competency determination—a detailed and fact-intensive individualized analysis—for clear error. See United States v. Cook, 356 F.3d 913, 918 (8th Cir. 2004) ("Th[e] competency determination is a factual finding we affirm unless clearly arbitrary or unwarranted, or clearly erroneous." (citation omitted)). As the government concedes, however, we review de novo the underlying legal question of whether the district court properly apportioned the burden of proof and applied the correct standard. Here, Washington's primary argument concerning competency is a challenge to the district court's allocation of the burden of proof.

We have repeatedly stated that the burden to prove incompetency to stand trial rests with the defendant. See, e.g., United States v. Mueller, 661 F.3d 338, 352 (8th Cir. 2011). Washington nevertheless argues that an open question remains because a circuit split exists, the Supreme Court itself has not resolved the issue, and our court previously has noted inconsistencies as to this issue. See United States v. Whittington, 586 F.3d 613, 617 (8th Cir. 2009) ("This court's opinions on the issue are inconsistent."); id. at 617–18 (collecting and discussing cases). In this instance, we need not dive more deeply into this question nor comment on the merit of Washington's argument. Here, even assuming we have been unclear as to the burden of proof, this simply is not a case where the burden of proof matters. See Medina v. California, 505 U.S. 437, 449 (1992) ("[T]he allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent."); see also Appellant's Brief at 9 ("the burden will only be essential to those cases where the evidence lies in perfect balance").

Federal statutes set forth the competency standard as well as procedures permitted or required for determining competency. See 18 U.S.C. § 4241(d) ("mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"); id. § 4247(b)–(d) (examinations, reports, and hearings). Here, the district court's determination relied heavily on Dr. Low's extensive and well-supported report. Dr. Low's opinions as to Washington's malingering were well explained and comprehensive. Her conclusions as to Washington's abilities relied on a lengthy period of observation, several substantive tests, and repeated clinical examinations. Her findings were consistent with Washington's repeated court appearances without suggestions of incompetency and his interactions over the phone and electronically while being observed. In addition, the district court permissibly discounted the much more cursory reports and opinions from Drs. Cohen and Cronin. In particular, the district court properly observed that the defense reports did not fully embrace the applicable standard, and at many points, particularly when critiquing Dr. Low, seemingly misconstrued the applicable standard and the questions at issue. The district court's competency determination enjoys more than ample support, was not clearly erroneous, and was not sufficiently close to consider the burden of proof a potential source of error.

Similarly, as to sentencing, we find no error in the district court's drug quantity or firearm-related Guidelines determinations. See United States v. Ramirez-Maldonado, 928 F.3d 702, 708 (8th Cir. 2019) (drug quantity calculations are "factual determination[s] reviewed for clear error"); United States v. Smith, 656 F.3d 821, 825–26 (8th Cir. 2011) (reviewing for clear error the question of whether a defendant possessed a firearm in connection with a drug offense). In the context of a conspiracy, the drug quantity for sentencing purposes includes not only quantities Washington was personally involved with, but "all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and

were reasonably foreseeable in connection with that criminal activity." USSG § 1B1.3 cmt. n.3(D). Here, as described, the conspirators operated essentially as a dispatch system with a centralized handler of a "dope phone" receiving calls for deliveries and sending conspirators to carry out the deliveries. Washington was not peripheral to this scheme. He served multiple roles as an armed participant, taking calls, dispatching couriers, and delivering drugs himself. Further, Washington used false documents to rent the home where he lived with the conspiracy's ultimate leader and where officers found Washington with a firearm and contraband. The scope of the conspirators' activities were reasonably foreseeable to Washington, and the quantities found by the district court are well supported by the record.

USSG § 2D1.1(b)(1) imposes a two-level increase to the offense level if a defendant possessed a firearm. Commentary to that subsection provides: "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id. cmt. n.11(A). Here, the proximity of the firearm to Washington and contraband at the time it was discovered support the district court's finding. See United States v. Anderson, 618 F.3d 873, 881 (8th Cir. 2010) ("We have . . . recognized that a well-known tendency of drug criminals to use firearms in connection with their drug activities supports an inference that a gun at a location near the drug activity was somehow connected to it."). Although Washington argues someone else might have surreptitiously placed the firearm in his wheelchair, his speculation in this regard discounts the fact that the firearm was positioned to be retrieved by the chair's occupant. The district court's firearm determination was not clearly erroneous.

Finally, we find no abuse of discretion in the ultimate sentence imposed. See United States v. Roberts, 747 F.3d 990, 992 (8th Cir. 2014). "We have declared it 'nearly inconceivable' to imagine a case where the district court imposed a below-Guidelines sentence and 'abused its discretion in not varying downward still further.'" United States v. Madison, 863 F.3d 1001, 1007 (quoting United States v.

Lazarski, 560 F.3d 731, 733 (8th Cir. 2009)).  Here, the most fair reading of the record shows that the court, when imposing sentence, placed considerable weight on Washington's role in the conspiracy and his physical and mental health limitations. The district court was entitled to do so.  Roberts, 747 F.3d at 992 ("[A] sentencing court has wide latitude to weigh the section 3553(a) factors in each case and assign some factors greater weight than others." (quoting United States v. Lozoya, 623 F.3d 624, 627 (8th Cir. 2010))).  In fact, the court did not express doubt or concern that the downward variance failed to go lower.  Rather, if anything, the court expressed doubt as to the wisdom of varying downward at all.  We find no abuse of discretion.

III.

We affirm the judgment of the district court.

_____