# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3769

_____

United States of America

*Plaintiff - Appellee*

v.

Breon Raquon Armstrong

*Defendant - Appellant*

_____

No. 21-3793

_____

United States of America

*Plaintiff - Appellee*

v.

Kendrick Ramon Page

*Defendant - Appellant*

_____

No. 22-1252

_____

United States of America

*Plaintiff - Appellee*

v.

Tristan Kareem Davis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern

_____

Submitted: December 15, 2022
Filed: February 24, 2023

_____

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Kendrick Page, Tristan Davis, and Breon Armstrong guilty of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846. In this consolidated appeal, the three raise numerous challenges to the admission of wiretap evidence, the jury instructions, the sufficiency of the evidence, and their sentences. We affirm.

**I.**

In the fall of 2019, federal law-enforcement authorities obtained two orders authorizing a wiretap of a cellphone believed to be used by Page. The applications and supporting affidavits alleged that there was probable cause to believe that Page and others were involved in a conspiracy to distribute controlled substances in and around Burlington, Iowa; that a wiretap would reveal further evidence of the nature of the conspiracy; and that conventional investigative methods (including physical surveillance, pen registers, mobile tracking devices, trash searches, package

interdiction, controlled drug buys, and undercover operations) had been unsuccessful in uncovering the full scope and membership of the conspiracy. Both orders instructed that the wiretaps must be "conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature." This meant that monitoring "must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception." A few months after the wiretaps were authorized, Page and seven others (including Davis and Armstrong) were indicted on a single count of conspiracy to distribute a controlled substance.

Page moved to suppress the evidence obtained from the wiretaps, contending that law enforcement lacked probable cause and necessity and failed to minimize their monitoring of his phone conversations as the orders required. The district court[1] denied the motion.

After all other indicted co-conspirators entered guilty pleas, Page, Davis, and Armstrong proceeded to trial. Over the course of the week-long trial, the Government presented extensive evidence that Page, Davis, and Armstrong were members of a drug-trafficking organization established in the early 2000s that operated primarily in and around Burlington. The Government's witnesses included members of the organization who sold drugs on behalf of the group and customers who bought them.

Numerous witnesses testified that Page played a central role in the conspiracy. He recruited members, asked members to transport and sell drugs, ordered members to collect drug debts, set prices for drugs, provided a phone so that members could coordinate distribution of drugs, directed members and customers to be careful not to talk on the phone about drug activities, and generally oversaw "his workers." Law-enforcement personnel also testified that searches of Page's residences

---

[1]The Honorable John A. Jarvey, Chief Judge of the United States District Court for the Northern District of Iowa, now retired.

revealed that Page possessed multiple firearms at the time he was leading the organization.

Witnesses also testified that Tristan Davis and Armstrong (who is Page's nephew) assisted Page with carrying out the organization's activities. David Davis and Keith Nash, former associates of the organization, testified that Page "brought up" Tristan Davis from Page's hometown of Shreveport, Louisiana, to assist with the organization's operations in Burlington and that the two "were together all the time." Nash also testified that Tristan Davis would accompany Page when Page supplied pound quantities of methamphetamine to customers. And Mikel Simmons, Phillip Jones, and Cody Neff—all former customers of the group—testified to observing Tristan Davis deliver drugs and collect debts on Page's behalf on multiple occasions. Officers also testified that drug paraphernalia, drug-packaging materials, and a firearm were found during a search of Tristan Davis's residence on Garnet Street in Burlington. As for Armstrong's part, Jones testified to being introduced to him by Page, obtaining drugs from him, and sometimes seeing him with as much as four pounds of methamphetamine at a time. Officers also testified that Armstrong was at the Garnet Street residence when they executed their search warrant.

In addition to witness testimony, the Government's evidence at trial included communications among Page, Davis, and Armstrong intercepted through the wiretap of Page's phone. These communications generally referred to drug-trafficking activity using coded or vague language. For instance, the Government presented transcripts of two phone calls between Armstrong and Page that occurred on October 16, 2019. In the first call, Armstrong told Page, "I need to get in [Tristan Davis's] house [because] I had something on the line, ya hear." Page responded, "What the fuck did he do with that . . . I don't know if he moved it. I'm finna see where he at with it. You still got it the line?" In the second call between Armstrong and Page, which took place about thirty minutes later, Page was heard talking to Tristan Davis in the background, asking him, "[W]hat you had did with that shit, [Tristan]—that umm clear shit, you know, from on top of the refrigerator. You know from your house." Page then relayed to Armstrong, "[T]his nigger says it's hidden in the

bushes down the street in a white bag," before saying to Davis, "Nephew needed some. Where at in the bushes?" Page then ended the call by telling Armstrong, "He's finna call you right now—try to guide you to it." Immediately after the call ended, Davis called Armstrong, but law enforcement did not intercept the content of that communication.

Another set of communications involving Page and Armstrong on October 20, 2019, is illustrative. The Government presented a transcript of a call to Page from an associate of the organization named Allen Fields in which Fields said, "I have somebody on deck need a whole one right now." Twenty minutes after that call, Armstrong texted Fields and told him that his "uncle [was] there with it waiting on you." Armstrong then texted Fields the cellphone number of Alphonso Edmond, an indicted co-conspirator also known as "Big Head." In another call fifteen minutes after Armstrong texted Fields, Page told Fields, "I'm finna see my nephew real quick—I'm finna have him bend down on you." Fields responded, "That nigger—he sent me to Big Head. This nigger Big Head tryin' charge a nigger 36." Page then cautioned, "You already know, man, I can't be on this call like this . . . you know what I'm saying?" These are merely a couple of examples of the numerous communications between Page, Davis, Armstrong, and their associates regarding drug-trafficking activity that the Government presented to the jury.

Central to the defense's theory at trial was that Page, Davis, and Armstrong were not members of a single conspiracy. Defense counsel therefore asked the court to give the jury a multiple-conspiracies instruction. The court declined to do so, explaining that "the evidence consistently showed . . . a singular purpose, exceedingly common identity of participants, [and an] incredibly small geography over a consistently large period of time." The jury returned a guilty verdict as to all three defendants.

All three defendants received below-guidelines sentences. For Page, the district court applied a guideline enhancement based on his use of a firearm in connection with the conspiracy, *see* U.S.S.G. § 2D1.1(b)(1), and a guideline

enhancement based on his leadership "of a criminal activity that involved five or more participants or was otherwise extensive," *see id.* § 3B1.1(a). With a criminal-history category of II and a total offense level of 43, Page's advisory guidelines range was life imprisonment. The district court ultimately imposed a sentence of 340 months' imprisonment followed by 10 years' supervised release. For Davis, the court applied a two-point base offense level increase on the basis that at least 10 pounds of methamphetamine and crack cocaine were attributable to him, *see id.* § 2D1.1(c), as well as a guideline enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance," *see id.* § 2D1.1(b)(12). Although Davis contended that he was entitled to a two-level minor-role reduction, *see id.* § 3B1.2(b), the court declined to apply one. With a criminal-history category of IV and a total offense level of 42, Davis's guidelines range was 360 months' to life imprisonment. The district court sentenced him to 280 months' imprisonment followed by 4 years' supervised release. Finally, with respect to Armstrong, the court determined that he had a criminal-history category of II and a total offense level of 38, for a guidelines range of 262 to 327 months' imprisonment. The district court sentenced him to 210 months' imprisonment followed by 5 years' supervised release.

Page, Davis, and Armstrong raise numerous issues on appeal. Page challenges the denial of his motion to suppress the wiretap evidence, the denial of his request for a multiple-conspiracies jury instruction, the application of the guideline enhancement for possession of a firearm, the application of the guideline enhancement for his leadership role in the conspiracy, and the substantive reasonableness of his sentence. Davis challenges the sufficiency of the evidence for his conviction, the application of the guideline enhancement for maintaining a premises used for distributing drugs, the drug-quantity determination, and the district court's refusal to apply a minor-role reduction. Armstrong, like Page, challenges the denial of his request for a multiple-conspiracies instruction and, like Davis, challenges the sufficiency of the evidence against him.

**II.**

We start with Page's argument that the district court erred in admitting the wiretap evidence. We apply a mixed standard of review when considering the denial of a motion to suppress, reviewing the district court's findings of fact for clear error and "the ultimate conclusion of whether the Fourth Amendment was violated" *de novo*. *United States v. Merrett*, 8 F.4th 743, 748 (8th Cir. 2021).

To obtain a wiretap, the government must establish the following:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [18 U.S.C. § 2516];

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Additionally, once a wiretap order is issued, the government must conduct surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." *Id*. § 2518(5). Page contends that the Government failed to establish the requirements under §§ 2518(3)(c) and (d) and failed to minimize its surveillance as required by § 2518(5). We disagree.

A.

Section 2518(3)(c) is known as the "necessity" requirement. *Merrett*, 8 F.4th at 749. To satisfy this requirement, the government need not "exhaust every available investigative technique." *Id.* Instead, it need only establish "that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator." *Id.* We will affirm a district court's finding of necessity unless substantial evidence does not support the determination, the determination "evolve[d] from an erroneous view of the applicable law," or "we, after reviewing the whole record, have a definite and firm conviction that the district court made a mistake." *Id.*

Page contends that the Government failed to establish necessity because the lengthy affidavits from Federal Bureau of Investigation Task Force Officer Nicholas Hiland submitted with the wiretap applications demonstrated the success of conventional investigatory techniques in gathering sufficient evidence to charge Page with conspiracy. True, the Hiland affidavits stated that investigative techniques such as physical surveillance, mobile tracking devices, controlled buys, and the like had been moderately successful in gathering evidence against Page. But the affidavits also explained in great detail how these conventional methods had failed—and would have likely continued to fail—to reveal the full extent of the organization's drug-trafficking activities and membership because, among other reasons, Page and his associates utilized various and frequently changing residences and vehicles. *See United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009) (concluding that necessity was established where "the government had obtained a significant amount of information about the extensive drug operation in which [the defendant] was a primary player" but "had not uncovered the sources of the cocaine in which he dealt"). The district court therefore did not clearly err in determining that the Government satisfied the necessity requirement.

We turn next to probable cause. Section 2518(3)(d) requires "'probable cause for belief that the facilities' are *either* (1) 'used, or are about to be used, in connection with the commission of [certain criminal offenses]' or (2) 'leased to, listed in the name of, or commonly used by [the suspect].'" *Merrett*, 8 F.4th at 750 (alterations in original) (quoting § 2518(3)(d)). "This probable-cause requirement is coextensive with the Fourth Amendment's probable-cause requirement." *Id.* Thus, the Government needed to show "a fair probability" based on "the totality of the circumstances" that the cellphone number identified in the wiretap applications "was used or was about to be used for criminal activities or that [Page], a person engaged in proscribed conduct, commonly used the cellphone." *See id.*

According to Page, the Government lacked probable cause because the relied-upon communications from the identified cellphone number did not establish a fair probability that he used the cellphone number or that such number was used in connection with drug-trafficking activity. Page cites the following text-message exchange allegedly from himself to a confidential human source known as "CHS #6" as an example:

| | |
|---|---|
| Page: | Wat it do? |
| Page: | This KP get at me. |

He also points to a phone conversation allegedly between himself and CHS #6 that occurred after the above texts:

| | |
|---|---|
| Page: | What's you talking about man? I'm not there, but it's there. |
| CHS #6: | Shit, man, I can do it all. |
| Page: | What's you talking about? |
| CHS #6: | Man, whatever you bring nigga I'm gonna get rid of, you already know. |
| Page: | What's you looking like? |

CHS #6:    I got a little money, I gots some money if that's what you talking bout.

Page:    You know I am gonna put you something on deck; but you know [inaudible]

CHS #6:    I got about two with me, two g's maybe three.

Page:    Let me know exactly so I know exactly what I need to do for you.

CHS #6:    Shit, I got put two five with it, two thousand five hundred

Page:    Ok, where you at? Where you fitting to be?

CHS #6:    I'm at the house though.

Page:    Ok, how long you gonna take you to get there I am fittin' to send my partner's cousin to you.

CHS #6:    Ok, give me about an hour.

Although Page insists these communications are innocuous, we find that they amply support probable cause under § 2518(3)(d), particularly when considered alongside additional communications cited in the Government's applications with which Page does not contend. For instance, Page ignores that the applications also describe a phone call between Page and CHS #6 that took place the day after the above-described phone conversation in which Page directed CHS #6 to an address in Burlington where CHS #6 eventually met Page's associate, Big Head, to purchase approximately 225 grams of methamphetamine for $2,500. The applications go on to explain that that phone call was followed by additional incriminating phone calls between Page and CHS #6 and associated drug deliveries. Accordingly, we find no error in the district court's determination that the Government's wiretap applications satisfied § 2518(3)(d)'s probable-cause requirement.

## C.

Page's final argument regarding the wiretap concerns § 2518(5)'s minimization requirement. This requirement "does not forbid the interception of all nonrelevant communications, but rather instructs the agents to conduct the surveillance in such a manner as to minimize the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978) (internal quotation marks omitted). To assess whether intercepted communications have been minimized in accordance

-10-

with § 2518(5), we must ask whether the government's actions were reasonable based on an "objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Id*. at 137. This "flexib[le]" inquiry considers a variety of factors, including "the criminal activity's scope, the investigating agents' reasonable expectations of the communications' content, the authorizing judge's continuing judicial supervision, the communications' length and origin, and whether the speakers relied on coded or ambiguous language." *United States v. Campbell*, 986 F.3d 782, 801 (8th Cir. 2021). We review for clear error the district court's finding that the government's minimization efforts were reasonable. *Id*.

Here, the orders authorizing the wiretaps expressly required minimization, providing that interception "must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception." But Page asserts that the Government failed to comply with this requirement because it intercepted at least 230 phone calls—many of which were between him and his wife—that were unrelated to any criminal activity.

Page's argument is unconvincing. At the outset, we note that the Government's minimization efforts were complicated by the fact that agents had reason to believe that the scope of Page's criminal enterprise was broad, that he used coded language when discussing his drug-trafficking activities, and that he often involved his family members in his crimes. *See United States v. Macklin*, 902 F.2d 1320, 1328 (8th Cir. 1990) ("More extensive wiretapping is reasonable when the investigation focuses on determining the scope of a widespread conspiracy. The same is true when the conversations are in the jargon of the drug trade." (citation omitted)); *United States v. Daly*, 535 F.2d 434, 442 (8th Cir. 1976) ("Since Daly's wife and personal friends were involved in the scheme, interception of many personal conversations was unavoidable."). Moreover, the 230 calls that Page cites represent fewer than three percent of the more than 9,000 calls that the Government intercepted. And, as the Government established at Page's suppression-motion hearing, the vast majority of these 230 calls were in fact minimized within two minutes. *Cf. Macklin*, 902 F.2d at 1328 ("[T]he government's conduct could be

reasonable even if the total number of conversations intercepted contained a high percentage of nonpertinent calls."). Finally, the Government's interception was subject to considerable supervision, including by the authorizing judge: monitoring agents were provided a memorandum outlining minimization procedures, were required to watch a minimization-training briefing, and reported on the status of their monitoring to the authorizing judge every fifteen days. *See Daly*, 535 F.2d at 442 (observing that "[c]ourts have been more willing to find good faith minimization" where agents are required to submit to the authorizing judge "interim reports showing what progress has been made with respect to the authorized objective and the need for continued interception"). For all of these reasons, the district court did not clearly err in finding that the Government complied with § 2518(5)'s minimization requirement.

\*     \*     \*

Accordingly, we conclude that the district court did not err in denying Page's motion to suppress.

## III.

We next consider whether the district court properly declined to give the multiple-conspiracies jury instruction that the defendants requested. We review a district court's rejection of a proposed jury instruction for an abuse of discretion. *United States v. Franklin*, 960 F.3d 1070, 1072 (8th Cir. 2020).

At trial, Page, Davis, and Armstrong relied on the defense theory that the three may have participated in discrete drug transactions but were not members of a single, overarching conspiracy. As Page's lawyer put it in his opening statement, "What's happened here is that we've got a conglomeration of people that know each other, that have separate sorts of transactions occurring, and that's not the Government conspiracy that they're alleging in the indictment." The defendants therefore requested a multiple-conspiracies jury instruction derived from the Eighth Circuit

-12-

Model Criminal Jury Instructions. In denying the request, the district court concluded that a multiple-conspiracies theory was unsupported by the evidence, which instead "consistently showed . . . a singular purpose, exceedingly common identity of participants, [and an] incredibly small geography over a consistently large period of time." The court also stated that the evidence that the defendants cited in support of their theory consisted of "instances in which one alleged conspirator didn't know what the other was doing," which were already "covered by the jury instructions that a conspirator doesn't need to know all the other conspirators, doesn't need to know the details, [and] doesn't have to agree to play a particular role."

Generally, a defendant is entitled to a jury instruction that explains his defense theory "if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law." *United States v. Faulkner*, 636 F.3d 1009, 1020 (8th Cir. 2011). In conspiracy cases, "[w]here the evidence substantially points to a single conspiracy, the district court does not need to give an instruction on multiple conspiracies." *United States v. Burris*, 22 F.4th 781, 786 (8th Cir. 2022) (internal quotation marks omitted). The Government does not contest that Page, Davis, and Armstrong's request was timely or that the proposed multiple-conspiracies instruction accurately stated the law. The only issue, then, is whether a multiple-conspiracies instruction was adequately supported by the evidence. We agree with the district court that it was not.

"Whether a given case involves single or multiple conspiracies depends on whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." *See Campbell*, 986 F.3d at 796 (internal quotation marks omitted). To determine whether the evidence tends to show "one overall agreement" as opposed to multiple, discrete agreements, we look to "the totality of the circumstances, including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." *See id*. at 797 (internal quotation marks omitted).

-13-

Here, the Government's evidence at trial overwhelmingly pointed to a single conspiracy with a singular purpose—selling methamphetamine and cocaine—a steady core membership—Page, Davis, Big Head, and others—operating primarily in the same territory—Burlington—over several years. Witnesses consistently described a single organization in which Page would recruit and oversee multiple underlings. Although Armstrong may have joined the conspiracy later than other members and membership in the organization may have fluctuated somewhat over the years, this is not necessarily evidence of separate conspiracies. *See Burris*, 22 F.4th at 786 ("It is well settled that the introduction of a new conspirator or an expansion of activity to new territory does not create a new conspiracy."). Accordingly, the district court did not abuse its discretion in declining to give the multiple-conspiracies jury instruction.

**IV.**

We now address whether the evidence was sufficient to sustain Davis's and Armstrong's convictions. Our review is *de novo*, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict[s]." *United States v. Atkins*, 52 F.4th 745, 751 (8th Cir. 2022). We will not reweigh the evidence or the credibility of the Government's witnesses. *See United State v. Moya*, 690 F.3d 944, 949 (8th Cir. 2012). Unless we conclude that no reasonable jury could have found Davis and Armstrong guilty beyond a reasonable doubt, we will affirm their verdicts. *See id.*

Davis and Armstrong were convicted of conspiracy to distribute drugs under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846. At trial, the Government needed to prove three things: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that Davis and Armstrong knew of the conspiracy; and (3) that they intentionally joined the conspiracy. *See United States v. Taylor*, 813 F.3d 1139, 1146-47 (8th Cir. 2016). The existence of a conspiracy may be established by either direct or circumstantial evidence, *United States v.*

*Whirlwind Soldier*, 499 F.3d 862, 870 (8th Cir. 2007), and a jury may rely on the testimony of co-conspirators and others involved in the conspiracy to determine whether a defendant knew of and intentionally joined the conspiracy, *Taylor*, 813 F.3d at 1147.

A.

We begin with Tristan Davis. He points to testimony from several witnesses that he says demonstrates that no reasonable jury could conclude that he voluntarily and intentionally agreed to enter into a drug-trafficking conspiracy. Specifically, he refers to the testimony of David Davis, a long-time former drug customer of Page's, who stated that he never purchased drugs from Tristan Davis and "never saw him do anything wrong." Tristan Davis also cites the testimony of Keith Nash, who implied that although Tristan Davis would be present when he purchased drugs from Page, he did not personally deal with him. Further, Tristan Davis argues that the testimony of Frederrick Reed, an indicted co-conspirator, and Wilbert Bowers, another former customer of Page's, support his sufficiency argument because neither stated that they bought drugs from Tristan Davis despite both saying that they frequently observed him with Page.

These cherry-picked trial excerpts fail to persuade us that no reasonable jury could find Tristan Davis guilty beyond a reasonable doubt. Indeed, ample witness testimony supports his conviction: David Davis testified that he understood from Page that Tristan Davis was recruited to work for Page in Burlington so that Page could "insulate[] him[self] from having to deal directly with users"; Nash testified that Tristan Davis was one of Page's "workers" and that he learned from Page that Tristan Davis was transporting methamphetamine on Page's behalf; Bowers testified to seeing Tristan Davis sell drugs around Burlington and being with Page "all the time"; Reed testified to witnessing Tristan Davis hand Page large sums of money multiple times; and Phillip Jones testified that he paid Tristan Davis for a portion of crack cocaine that he obtained from Page because "that's where [he] was told to take the money."

-15-

In addition to this trial testimony, communications obtained from the wiretap further support Davis's conviction. The October 16, 2019 calls between Page and Armstrong are particularly compelling: when Armstrong told Page, "I need to get in [Tristan's] house [because] I had something on the line, ya hear," Page exclaimed, "What the fuck did he do with that . . . I don't know if he moved it. I'm finna see where he at with it." Thirty minutes later, Page again spoke to Armstrong on the phone and was heard talking to Davis in the background, asking, "[W]hat you had did with that shit, [Tristan]—that umm clear shit, you know, from on top of the refrigerator. You know from your house." After Davis explained to Page that he placed something in the bushes down the street, Page advised Armstrong that Davis would "call you right now—try to guide you to it." And sure enough, right after the call ended, Davis called Armstrong.

In sum, viewing the evidence in the light most favorable to the Government, resolving conflicts in the Government's favor, and accepting all reasonable inferences that support the verdict, we conclude that there was sufficient evidence to support Tristan Davis's conviction.

## B.

Next, we turn to Armstrong's sufficiency-of-the-evidence challenge. He contends that the evidence is insufficient to sustain his conviction because the Government presented no physical evidence connecting him to any controlled buy or controlled payment or establishing his possession of any drug packaging, drug paraphernalia, or marked currency.

Armstrong's argument is meritless. Because both witness testimony and evidence gathered from the Government's wiretap amply demonstrate his sustained involvement in the conspiracy, an alleged lack of physical evidence is beside the point. *See Moya*, 690 F.3d at 949 (explaining that a conspiracy may be proven by circumstantial evidence and that evidence of a mere "tacit understanding" is sufficient to establish a defendant's membership in the conspiracy). The testimony

of Jones, the October 16, 2019 intercepted call with Page and Tristan Davis discussing the "clear shit," and the October 20, 2019 intercepted text messages where Fields told Page that Armstrong "sent me to Big Head" are especially illustrative of Armstrong's role as Page's deputy when it came to drug transactions. Viewing the evidence in the light most favorable to the Government, resolving conflicts in the Government's favor, and accepting all reasonable inferences that support the verdict, we conclude that there was sufficient evidence to support Armstrong's conviction.

## V.

We arrive now at the various sentencing-guidelines issues raised by Page and Davis. We review the district court's factual findings regarding the applicability of guidelines enhancements and reductions for clear error, and we review its interpretation of the guidelines *de novo*. *United States v. Lewis*, 976 F.3d 787, 797 (8th Cir. 2020).

### A.

Page challenges the district court's application of two guideline enhancements: possession of a firearm in connection with a drug-trafficking conspiracy, U.S.S.G. § 2D1.1(b)(1), and being the leader of a criminal activity involving five or more participants (or one that is "otherwise extensive"), *id.* § 3B1.1(a).

#### 1.

Beginning with the firearm enhancement, § 2D1.1(b)(1) applies where the government proves "by a preponderance of the evidence that the defendant possessed a dangerous weapon (including a firearm) while violating 21 U.S.C. § 841(b)." *United States v. Savage*, 414 F.3d 964, 966 (8th Cir. 2005) (internal quotation marks omitted). The government need not establish that a defendant "used or even touched a weapon to prove a connection between the weapon and the

offense." *Id*. at 967. And although the "mere presence of a firearm" is not enough for the enhancement to apply, such as when a defendant keeps "an unloaded hunting rifle in the closet," the enhancement generally applies where a firearm is present and it is not "clearly improbable that the weapon was connected with the offense," such as when a firearm "was readily accessible during [a defendant's] drug dealing activities." *See id*. at 966-67.

Here, the Government presented substantial evidence in support of a § 2D1.1(b)(1) enhancement. At trial, officers testified that they located firearms, magazines, and ammunition during a search of one of Page's residences on Sunnyside Avenue in Burlington, as well as a rifle, a bag of marijuana, and a bag of cash during a search of another of Page's residences on Leffler Street. Moreover, officers testified that Page was present at the Leffler Street residence when they arrived to execute their search. At Page's sentencing, the Government also presented testimony from Phillip Jones and another former customer of Page's, Cassandra Lewis, who both stated that they regularly observed Page carrying a gun on his person during his drug-trafficking activities. Accordingly, we find no clear error in the district court's application of the § 2D1.1(b)(1) firearm enhancement.

2.

As for the leadership enhancement, § 3B1.1(a) applies where the government proves by a preponderance of the evidence that "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *United States v. Musa*, 830 F.3d 786, 788 (8th Cir. 2016). To determine whether a defendant was an "organizer or leader," courts look to "the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." § 3B1.1, cmt. n.4. At a minimum, the government must establish that the defendant "directed at least one other participant." *Musa*, 830 F.3d

at 788. A "participant" is one "who is criminally responsible for the commission of the offense, but need not have been convicted." *Id*. (quoting § 3B1.1, cmt. n.1).

Here, trial testimony established that the drug-trafficking conspiracy involved at least five participants, including Page, Tristan Davis, Armstrong, Big Head, Bowers, Reed, and others. And several witnesses indicated that Page played a central role in directing other participants. To take just a few examples: Keith Nash testified that Big Head was one of Page's "workers" who "sold dope for him" and that Page recruited others, including Tristan Davis, to work for him in Burlington; Mikel Simmons stated that although he physically received crack cocaine from different people in Burlington, his "understanding was that it was coming from Mr. Page"; and Reed explained that Page asked him to assume responsibility for the phone that Page's customers would call to order drugs.

Page dismisses this testimony as "exaggerated." But we are in no position to second-guess the district court's assessment of witness credibility. *See United States v. McArthur*, 11 F.4th 655, 660 (8th Cir. 2021). And regardless, intercepted communications from the Government's wiretap provided additional and substantial evidence of Page's leadership role. Accordingly, we conclude that the district court did not clearly err in applying the § 3B1.1 enhancement.

B.

We deal next with Tristan Davis's challenges to the district court's determination that over 10 pounds of methamphetamine was attributable to him, its application of a sentence enhancement for maintaining a premises used for distributing drugs, and its refusal to apply a minor-role reduction.

1.

We start with the district court's drug-quantity determination. Under the sentencing guidelines, the base offense level for conspiracy to traffic drugs is 38 if

-19-

the quantity attributable to the defendant includes at least 4.5 kilograms, or 9.92 pounds, of ice methamphetamine.  U.S.S.G. §§ 2D1.1(a)(5), (c)(1).

"Where there is no drug seizure or the amount seized does not reflect the scale of the offense," as here, a district court shall determine, by a preponderance of the evidence, the "approximate" quantity of the controlled substance for which the defendant is responsible.  § 2D1.1, cmt. n.5.  The court "may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct," *McArthur*, 11 F.4th 659, and its approximation may be "based on imprecise evidence" so long as it is supported by the record, *United States v. Yellow Horse*, 774 F.3d 493, 497 (8th Cir. 2014); *see also United States v. Washington*, 968 F.3d 860, 865 (8th Cir. 2020) ("In the context of a conspiracy, the drug quantity for sentencing purposes includes not only quantities [the defendant] was personally involved with, but all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity." (internal quotation marks omitted)).  We will reverse a drug-quantity finding "only when the entire record definitely and firmly illustrates that the lower court made a mistake."  *McArthur*, 11 F.4th 659.

The district court's finding that Davis was responsible for at least 10 pounds of ice methamphetamine, and that he therefore should be attributed a base offense level of 38, was adequately supported by the evidence at trial.  The Government presented evidence that Davis's membership in the conspiracy dated as far back as 2000 or 2001.  Witnesses stated that Davis regularly provided buyers distribution-level quantities of methamphetamine or accompanied Page when Page would do the same.  Nash, for instance, testified that Davis was present when Nash would obtain pounds of ice methamphetamine from Page.  And taking into account those drug deliveries by Davis's co-conspirators that were "in furtherance of . . . the jointly undertaken criminal activity and . . . reasonably foreseeable in connection with that criminal activity," *see Washington*, 968 F.3d at 865, brings the total even higher.

For example, Reed, another indicted co-conspirator, testified that Page supplied him with pound quantities of ice methamphetamine—sometimes as much as 5 pounds at once—on a weekly basis to sell to customers, and that this continued for as long as a year and a half. In sum, we are not convinced that the district court clearly erred in attributing at least 10 pounds of ice methamphetamine to Davis.

2.

Proceeding to the district court's application of the premises enhancement, § 2D1.1(b)(12) provides a two-level offense enhancement where the government establishes that the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." The enhancement applies to "a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." § 2D1.1(b)(12), cmt. n.17. Although drug manufacturing or distribution must be among the primary or principal uses for the premises, these "need not be the sole purpose[s] for which the premises was maintained." *United States v. Hernandez Lopez*, 24 F.4th 1205, 1208 (8th Cir. 2022) (internal quotation marks omitted) (holding that the enhancement was properly applied even though the premises was also used as a family home).

Here, the district court concluded that the § 2D1.1(b)(12) enhancement applied in light of the drug paraphernalia, drug-packaging materials, and firearm found during a search of Tristan Davis's Garnet Street residence. Davis does not dispute that he was the lessee of this premises at the time that the Government alleged that he was engaged in drug trafficking with Page and others. He instead contends that the Government failed to establish that the Garnet Street residence was the location of "substantial drug-trafficking activities." *See United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012). We disagree.

In addition to the recovery of drug-packaging material and other indicia of drug distribution from the residence, wiretap evidence also indicated that the Garnet Street property served as a base of operations for the conspiracy. In the series of calls between Page and Armstrong on October 16, 2019, for instance, Armstrong said, "I need to get in [Tristan's] house [because] I had something on the line, ya hear." Page responded in a subsequent call by asking Davis, "What you had did with that shit, [Tristan]—that umm clear shit, you know, from on top of the refrigerator. You know from your house." That officers were unable to recover an appreciable quantity of drugs from the premises during their investigation does not convince us that a premises enhancement was improper. *See United States v. Garcia*, 774 F.3d 472, 474-75 (8th Cir. 2014) (holding that district court did not clearly err in applying enhancement where testimony showed that premises was used to store vehicles used in drug conspiracy). There was no clear error in the district court's application of § 2D1.1(b)(12).

3.

Davis's final sentencing argument concerns the district court's decision not to apply § 3B1.2(b), which provides for a two-point offense-level reduction where "the defendant was a minor participant in any criminal activity." We need not say much on this issue, as our above discussion has already made plain that Davis's involvement in the conspiracy was extensive and longstanding. Although he may have played a lesser role than Page, the evidence does not demonstrate that Davis was "*substantially* less culpable than the average participant in the criminal activity." *See United States v. Jones*, 25 F.4th 1077, 1079-80 (8th Cir. 2022) (quoting § 3B1.2, cmt. n.3(A)); *see Hernandez Lopez*, 24 F.4th at 1208-09 ("[O]ur cases make it clear that merely showing the defendant was less culpable than other participants is not enough to entitle the defendant to the [§ 3B1.2(b)] adjustment if the defendant was deeply involved in the offense."). We therefore find no clear error in the district court's determination that Davis was not entitled to a minor-role reduction under § 3B1.2(b).

## VI.

Finally, we address the substantive reasonableness of Page's sentence, which we review for an abuse of discretion. *See United States v. Jackson*, 33 F.4th 523, 527 (8th Cir. 2022). "A district court abuses its discretion when it (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (internal quotation marks omitted). We presume that a below-guidelines sentence, as here, is substantively reasonable. *United States v. Barraza*, 982 F.3d 1106, 1116 (8th Cir. 2020). Moreover, "[i]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *Jackson*, 33 F.4th at 527.

This is no unusual case. Nothing suggests that the court abused its discretion by failing to consider a relevant factor, considering an improper factor, or committing a clear error of judgment in weighing the factors. The district court expressly indicated that it considered all of the applicable factors under 18 U.S.C. § 3553(a). In the end, the court acknowledged Page's "tragic life events" as a mitigating factor, but it found that the long-running nature of the conspiracy, the "huge" quantity of drugs distributed, Page's involvement of his family in his criminal affairs, his possession of firearms, and the use of credible threats of violence were all significant aggravating factors. Ultimately, the court imposed a below-guidelines sentence, varying downward from a guidelines range of life imprisonment to 340 months' imprisonment and 10 years' supervised release. We conclude that Page's sentence is not substantively unreasonable.

## VII.

For the foregoing reasons, we affirm the convictions and sentences of Kendrick Page, Tristan Davis, and Breon Armstrong.

_____